F I L E D

FEB 2 8 2005      NF.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

EUROHOLDINGS CAPITAL & INVESTMENT CORP., )
f/k/a ATHENIAN CAPITAL HOLDINGS, S.A., )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
HARRIS TRUST & SAVINGS BANK,            )
                                        )
            Defendant.                  )

**05C 1181**

JURY TRIAL DEMANDED

**JUDGE NORGLE**

**COMPLAINT**

**MAGISTRATE JUDGE DENLOW**

**INTRODUCTION AND NATURE OF THE CASE**

1.      As part of expanding its futures and financial services business, Athenian Capital

Holdings, S.A. ("Athenian") had a contract to purchase 90 percent of the equity of LFG, LLC

("LFG"), a futures commission merchant doing business in Chicago. However, defendant Harris Trust

& Savings Bank ("Harris"), through a course of conduct involving tortious interference, fiduciary

breach, fraud and duress, improperly derailed that contract, in the process seizing for itself substantial

sums of money to which it had no right. As part of this course of wrongful and malicious conduct,

Harris induced Athenian to invest, and then prevented Athenian from recovering, millions of dollars.

For its substantial losses, Athenian (now known as Euroholdings Capital & Investment Corp.) is due

compensation from Harris, whose conduct also warrants an award of punitive damages.

2.      Harris embarked on its course knowing that Athenian's contract to purchase LFG was

confidential, and having a duty not to reveal or use such confidential information to its own advantage –

which Harris nonetheless did. In the process, Harris improperly used its position and leverage as

- 1 -

LFG's bank to mislead and pressure LFG to accept, as the saying goes, "an offer that it couldn't refuse" from Refco Group Ltd., LLC ("Refco"), a valued (and larger) Harris customer that, as a result, replaced Athenian as the buyer of LFG.

3.     But Harris did not stop there. Having redirected the LFG sale to Refco, Harris next proceeded to redirect – to itself – money that was rightfully due Athenian. This was accomplished when, among other things, Refco temporarily took control of more assets and funds than it was actually purchasing, and then "returned" at least some of the funds to LFG in such a way that Harris could seize millions of dollars for itself – despite the fact that Harris had no right under the law to do so.

4.     Harris' actions violate the law and run counter to fundamental principles of justice, equity and good conscience. Accordingly, Athenian seeks redress in this Court.

## PARTIES, JURISDICTION AND VENUE

5.     Plaintiff, Euroholdings Capital & Investment Corp. ("Euroholdings"), is a Greek corporation with its principal place of business in Athens, Greece. Euroholdings was formerly known as Athenian Capital Holdings, S.A. ("Athenian").

6.     Defendant Harris Trust & Savings Bank ("Harris") is a banking corporation chartered in the State of Illinois, with its principal place of business in Chicago, Illinois.

7.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332, in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and a citizen of a foreign state.

- 2 -

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that this is a district where the defendant resides, and in which a substantial part of the events or omissions giving rise to the claim occurred.

### GENERAL ALLEGATIONS

### Athenian's Agreement to Purchase LFG

9.     In or about July 1999, Paul Papadopoulos, the managing director and a primary shareholder of Athenian, entered into discussions with LFG regarding the purchase of LFG. LFG, which had its principal place of business in Chicago, was engaged in business as a futures commission merchant. As a futures commission merchant, LFG bought and sold commodity futures contracts and options on commodity futures contracts on behalf of customers who maintained accounts with LFG. LFG also traded commodity interests via proprietary accounts of LFG members.

10.     By December 31, 1999, Athenian and LFG had entered into a purchase agreement whereby Athenian would purchase 90 percent of the equity in LFG (the "Athenian Purchase Agreement"). The Athenian Purchase Agreement provided, among other things, that $5 million in loans that Papadopoulos and his wife, Stamatia Carras, had made to LFG in or about August and October 1999, respectively, in connection with the purchase would be converted at closing into equity for Athenian in LFG. LFG's proprietary trading arm was excluded from the purchase. The agreement also envisioned and required that the Athenian-LFG deal be kept confidential.

11.     In anticipation of closing the LFG purchase, Athenian also, among other things, acquired 25 percent of the capital stock, and thus become the largest shareholder, of the British company Union plc ("Union"), at a cost of about $13 million. Union, whose shares were traded on the

- 3 -

London stock exchange, was involved in, among other things, the business of brokering futures. (Papadopoulos was already also an investor in a futures brokerage operating in Athens.) The LFG acquisition was integral to the expanding futures and financial services business of Athenian, whose shares were publicly traded on the Athens stock exchange.

## Harris' Relationship with LFG

12.     In 1998, Harris, along with two other banks, had entered into a subordinated loan agreement with LFG (the "Harris Loan Agreement"). The loan was subordinate to the interests of general unsecured creditors. Harris was the agent for the other two banks and thus led the consortium. Under the loan arrangement, LFG could borrow up to $13.5 million on a revolving basis, $8.5 million of that being from Harris. LFG used the funds borrowed under the credit line to satisfy its regulatory capital requirement.

13.     Among other things, the Harris Loan Agreement provided that Harris had no right of set-off, and that there could be no prepayment or acceleration of the loan's maturity date without prior written approval of (i) the Chicago Board Options Exchange, of which LFG was a member, and (ii) the Commodity Futures Trading Commission ("CFTC") and/or the Chicago Mercantile Exchange, which regulated the loan.

14.     Harris also served as LFG's settlement bank, and had done so for LFG or for Linnco Futures Group, Inc. (LFG's controlling shareholder) since at least 1990. In that role, Harris handled the daily transmission and receipt of funds to and from various commodity exchanges to which LFG belonged. On information and belief, associated with the settlement bank role was an additional credit line of approximately $20 million from Harris alone to LFG, which was used to cover amounts due the

- 4 -

exchanges from LFG's customers while LFG undertook to obtain those amounts from the customers themselves.

15.     Moreover, from time to time LFG also maintained a number of bank accounts at Harris, including at least 15 accounts on or about February 1, 2000. These accounts included LFG's main operating, or "house" account.

## Harris Learns of Athenian's Agreement to Purchase LFG

16.     By at least mid-December 1999, Harris was aware of Athenian's pending purchase of LFG, including the fact that the Papadopoulos and Carras loans would be converted into equity for Athenian in LFG, and the fact that the LFG acquisition was integral to Athenian's expanding futures and financial services business, including its $13 million acquisition of Union stock.

17.     Also by at least mid-December 1999, Athenian had requested that Harris continue to serve as the primary lender and settlement bank for its long-time customer LFG after Athenian's purchase of LFG closed. Harris was receptive to this request and did not indicate at the time that it would cease serving as LFG's banker. In fact, in December 1999 Harris extended the maturity date of the Harris Loan by one month, and extended it again by one month in January 2000.

18.     In connection with its request for Harris to serve as lender and settlement bank, Athenian had a reasonable expectation of confidentiality. LFG was a long-time customer of Harris; Harris was in a position of trust; and Athenian, as the incoming owner of LFG seeking the approval of Harris (and the other banks in the Harris consortium) for an ongoing lending and banking relationship, provided various information to Harris (and the other banks) that it otherwise would not have – not the least of which was the existence of the confidential agreement for Athenian to purchase LFG. In

- 5 -

meetings involving Harris, Athenian indicated that the agreement was confidential, as were Athenian's other efforts in expanding its futures and financial services business. In this context, Harris was thus aware that Athenian's pending acquisition of LFG was confidential.

## Harris Interferes with Athenian's and LFG's Dealings

19.     As Harris also became aware, though, on or about February 3, 2000, pending Athenian's acquisition of LFG, Carras, for Athenian, loaned LFG an additional $2 million (approximately), and shortly thereafter, on or about February 8, 2000, Athenian agreed to loan LFG about another $10 million, again with the understanding that these funds would be converted into equity in LFG. The $10 million in Athenian funds would not be received by LFG until February 29, 2000. (Papadopoulos and Carras subsequently assigned to Athenian any claims or interests with respect to their loans.)

20.     Knowing of the money invested by Carras (and Papadopoulos), and of the upcoming $10 million infusion from Athenian; knowing of the confidential Athenian Purchase Agreement; but concerned, among other things, for its own exposure on loans to LFG, in February 2000 Harris introduced Refco, another (larger) customer of Harris, to the possibility of Refco purchasing LFG. Via Harris, Refco became aware of the confidential Athenian-LFG deal. In return, Refco later paid Harris a $250,000 "fee" that essentially amounted to a brokerage commission for Harris presenting the LFG opportunity to Refco and facilitating Refco's acquisition of LFG.

21.     Knowing of the money invested by Carras (and Papadopoulos), and of the upcoming $10 million infusion from Athenian; knowing that these investments were made by Athenian in anticipation of closing the LFG purchase; and knowing that Athenian wanted Harris to continue serving

- 6 -

as LFG's lender and settlement bank, Harris omitted to tell Athenian that it did not want Athenian to acquire LFG, and that it would cease serving as LFG's lender and/or cease serving as LFG's settlement bank.

22.    On March 2, 2000 — a mere two days after the $10 million infusion from Athenian — Refco, notwithstanding the confidential Athenian Purchase Agreement, told LFG it was interested in purchasing LFG itself.

23.    Within days, Harris met with representatives of Athenian and LFG and informed them that Harris would not extend the maturity date on the Harris Loan further. As Harris knew, this meant that LFG faced an imminent threat of being undercapitalized and, thus, being legally required to immediately cease operations and surrender its customer accounts. (Harris had previously undertaken to extend the maturity date to September 15, 2000, and LFG would be deemed undercapitalized if the maturity date on the Harris Loan — which LFG used to satisfy its regulatory capital requirement — was less than six months in the future. In other words, Harris' announcement meant that LFG would be deemed undercapitalized on or about March 15, 2000, and face the imminent cessation of its operations, and surrender of its customer accounts.)

24.    At about this time, Harris also told LFG that, if Athenian proceeded further with the purchase of LFG, Harris would cease being LFG's settlement bank within about two weeks. As noted above, the settlement bank relationship was the vehicle through which LFG conducted its customers' business trading on the exchanges (and thus its own business). Given the termination on short notice by Harris, and the limited number of banks providing such services, LFG would be (and was) unable to obtain another settlement bank.

- 7 -

25.     In the wake of these announcements by Harris, Refco continued to pursue the purchase
of LFG. On or about March 13, 2000, representatives of Refco and LFG met, and Refco outlined a
plan to purchase most of the assets (primarily the customer accounts) of LFG. Refco followed up on
this meeting by sending a written offer to LFG on or about March 14, 2000, with a deadline for LFG to
accept or decline by 5:00 p.m. on March 17, 2000.

26.     On or about March 16, 2000, while the Refco offer was still open, Harris, consistent
with its announcement that it would not extend the Harris Loan's maturity date, sent LFG a notice of
default under the Harris Loan Agreement, demanding that the outstanding principal of $13.5 million,
plus interest, be paid by August 31, 2000 – that is, in less than six months. As a result, and as Harris
knew, LFG was undercapitalized pursuant to CFTC regulations, and faced the prospect of immediate
cessation of business, and surrender of customer accounts.

27.     The deadline for LFG to respond to Refco's offer came the next day, March 17, 2000.
Given the situation in which it had been placed by Harris, LFG reluctantly accepted Refco's offer.
LFG ultimately received about $6.3 million in consideration from Refco for the purchase. The Athenian
Purchase Agreement, by comparison, had provided for consideration to LFG in excess of $36 million.

**Harris Makes Sure Athenian Is Not Repaid**

28.     Refco and LFG proceeded to memorialize Refco's purchase in an agreement that
was executed on or about April 5, 2000 (the "Refco Purchase Agreement"). In connection with the
Refco Purchase Agreement, Athenian, which had put $17 million of capital into LFG in anticipation of
closing its own purchase of the company, and which could not afford to lose those funds, agreed that
LFG could repay it $10 million by May 15, 2000, with the remainder being paid, at certain intervals, by

- 8 -

the end of September 2000. To secure its obligation, LFG granted Athenian a security interest in all of LFG's rights under the Refco Purchase Agreement, including the right to receive certain subsequent payments under the agreement. Refco consented to this grant of a security interest.

29.     Athenian was unaware at the time that Harris would soon divert funds from LFG, thereby making it impossible for LFG to, among other things, pay Athenian the $10 million by May 15, 2000, and the remaining sum by the end of September 2000. Moreover, had Athenian not toed the line drawn by Harris, and not let Refco seize LFG, it would have been left, as a result of Harris' actions, with a $17 million liability due from, and a contract to purchase, an undercapitalized company that was subject to the imminent cessation of its business and surrender of its customer accounts.

30.     As Harris was aware, Refco's purchase of LFG was to (and did) close on or about May 1, 2000, with certain assets being transferred then from LFG to Refco. In connection with this, Harris and Refco, on information and belief, made plans to divert funds and to repay the Harris Loan within days of the closing – despite the fact that there was no regulatory approval for such a repayment, as required by the Harris Loan Agreement.

31.     At closing, Refco took control of more assets than the Refco Purchase Agreement provided for it to. On information and belief, at least some of these assets consisted of funds on deposit with and/or in various exchanges and/or accounts. Refco indicated that there would be a reconciliation and return of at least some of the assets/funds.

32.     Within a few days of the closing, Refco sent about $2.5 million back to LFG's house account at Harris, in which there was already at the time about another $3 million. Harris knew in advance that the money was coming; Refco told Harris that it was. When the money arrived, Harris

- 9 -

took $5 million out of LFG's house account and used it to pay down the Harris Loan. Harris did so knowing that it did not have authorization from LFG to do so, knowing that there was no regulatory approval to do so (as required by the Harris Loan Agreement), and knowing that it had no right of setoff under the Harris Loan Agreement.

33.     LFG was to pay Athenian $10 million by May 15, 2000. Accordingly, after the improper $5 million transfer from LFG's house account, Athenian on or about May 11, 2000 warned Harris that no funds should be paid out of LFG's accounts at Harris without the prior written approval of Athenian.

34.     Harris disregarded Athenian's warning. On or about May 12, 2000, Harris withdrew another $8.5 million from LFG's house account and used it to pay off the Harris Loan. On information and belief, the withdrawal and payoff were made in conjunction with Refco telling Harris that it would be sending, and actually sending, $8.5 million to LFG's bank account at Harris. Harris made the withdrawal and payoff again knowing that it did not have authorization from LFG (or Athenian) to do so, again knowing that there was no regulatory approval to do so (as required by the Harris Loan Agreement), and again knowing that it had no right of setoff under the Harris Loan Agreement.

35.     As a result of the $13.5 million in transfers, withdrawals and payoffs by Harris in the first half of May 2000, LFG was unable to pay Athenian the $10 million due by May 15, 2000, or the remaining millions of dollars due Athenian by the end of September 2000. LFG demanded that Harris return the $13.5 million, but Harris refused. On or about May 18, 2000, Athenian reminded Refco that it had consented to LFG granting Athenian a security interest in all of LFG's rights under the Refco Purchase Agreement, including the right to receive the subsequent payments under the agreement.

- 10 -

Accordingly, Athenian instructed Refco that, among other things, the subsequent payments due under the Refco Purchase Agreement should be made directly to Athenian. Consistent with the prior diversion of funds, Refco disregarded Athenian's instructions and did not make the subsequent payments, which amounted to about $6 million, to Athenian. LFG commenced liquidating its remaining assets, and ultimately filed a bankruptcy petition; a plan of liquidation was subsequently entered by the bankruptcy court.

36.     Without the purchase of LFG, and having lost millions of dollars, Athenian was unable to proceed with the expansion of its futures and financial services business. Athenian sold its shares in Union at a loss of about $4.4 million, and suffered other losses, including lost profits.

## COUNT I
## Tortious Interference with Contract and/or Business Relations

37.     Athenian incorporates paragraphs 1-36 above as if fully set forth herein.

38.     There was a valid and enforceable contract (the Athenian Purchase Agreement) between Athenian and LFG, and Athenian had a valid business expectancy in its expanding futures and financial services business. Harris was aware of the contract, and of Athenian's expectancy, including Athenian's efforts and investments (such as the $13 million acquisition of Union stock) to expand its futures and financial services business. Harris intentionally, unjustifiedly and maliciously interfered with the contract and with the business expectancy and expansion, and/or induced and caused the breach of the contract. Athenian was damaged as a result.

WHEREFORE, Athenian respectfully requests that this Court:

a.      enter judgment in its favor;

- 11 -

b.  award Athenian compensatory and punitive damages, including interest as allowed by law;

c.  award Athenian its costs and fees as allowed by law; and

d.  award Athenian such other and further relief as the Court may deem just and proper.

## COUNT II
## Breach of Fiduciary Duty

39.  Athenian incorporates paragraphs 1-38 above as if fully set forth herein.

40.  Harris – knowing that Athenian needed and desired Harris to remain as the primary lender and settlement bank for its long-time customer LFG, which Athenian was acquiring; and knowing of the confidential nature of the Athenian-LFG deal – had fiduciary duties to Athenian. Likewise Harris had fiduciary duties to Athenian by virtue of the control it exercised over the bank accounts of LFG, of which Athenian was a creditor; and by virtue of the key role the Harris Loan played in satisfying the regulatory capital requirements of LFG, which Harris knew Athenian was to acquire. These fiduciary duties included the duty to exercise reasonable care, skill and diligence; the duty of loyalty; the duty of good faith; and the duty to maintain the confidentiality of Athenian's sensitive information.

41.  Harris breached these duties, *inter alia,* by revealing Athenian's pending acquisition of LFG to Refco; by abusing the power Harris inherently had vis-a-vis the Harris Loan arrangement by, e.g., improperly demanding and helping itself to prepayment without authority; and/or by exercising control over LFG's accounts at Harris in such a way as to serve Harris' self-interest via improperly withdrawing funds from those accounts for Harris' own benefit – all at the expense of Athenian. Athenian was damaged as a result.

- 12 -

WHEREFORE, Athenian respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Athenian compensatory and punitive damages, including interest as allowed by
      law;

c.    award Athenian its costs and fees as allowed by law; and

d.    award Athenian such other and further relief as the Court may deem just and proper.

## COUNT III
## Fraud

42.    Athenian incorporates paragraphs 1-41 above as if fully set forth herein.

43.    Harris omitted to tell Athenian that it would cease serving as LFG's lender and/or cease

serving as LFG's settlement bank, that it did not want Athenian to acquire LFG, and that it would divert

funds from LFG. Harris had the opportunity and the duty to inform Athenian of such material facts.

But Harris intended to induce Athenian to act, and Athenian did so act (in reasonable reliance), by

investing millions of dollars in LFG, only to have Harris, on the heels of this investment, cease serving as

LFG's lender and settlement bank (not to mention improperly demand and help itself to prepayment

without authority), thereby derailing the very acquisition of which the investment was a part. Athenian

was damaged as a result.

WHEREFORE, Athenian respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Athenian compensatory and punitive damages, including interest as allowed by
      law;

c.    award Athenian its costs and fees as allowed by law; and

- 13 -

d.     award Athenian such other and further relief as the Court may deem just and proper.

## COUNT IV
### Tortious Interference with Contract

44.     Athenian incorporates paragraphs 1-43 above as if fully set forth herein.

45.     In early April 2000, Athenian, which had put about $17 million of capital into LFG, agreed with LFG that LFG could repay it $10 million by May 15, 2000, with the remainder being paid, at certain intervals, by the end of September 2000. As a result of the $13.5 million in transfers, withdrawals and payoffs by Harris in the first half of May 2000, LFG was unable to pay Athenian the $10 million due by May 15, 2000, or the remaining millions of dollars due Athenian by the end of September 2000. Harris was aware of the agreement. Harris intentionally, unjustifiedly and maliciously interfered with the agreement; and/or induced and caused the breach of the agreement. Athenian was damaged as a result.

WHEREFORE, Athenian respectfully requests that this Court:

a.     enter judgment in its favor;

b.     award Athenian compensatory and punitive damages, including interest as allowed by law;

c.     award Athenian its costs and fees as allowed by law; and

d.     award Athenian such other and further relief as the Court may deem just and proper.

## COUNT V
### Conspiracy

46.     Athenian incorporates paragraphs 1-45 above as if fully set forth herein.

47.     Harris and Refco agreed to unlawfully divert the LFG opportunity to Refco, and/or to unlawfully divert funds due Athenian; performed overt acts in furtherance thereof; and caused injury to Athenian as a result.

WHEREFORE, Athenian respectfully requests that this Court:

a.      enter judgment in its favor;

b.      award Athenian compensatory and punitive damages, including interest as allowed by law;

c.      award Athenian its costs and fees as allowed by law; and

d.      award Athenian such other and further relief as the Court may deem just and proper.

## COUNT VI
## Unjust Enrichment

48.     Athenian incorporates paragraphs 1-47 above as if fully set forth herein.

49.     Harris unjustly retained sums equitably due Athenian. Harris' retention of these sums violated fundamental principles of justice, equity and good conscience.

WHEREFORE, Athenian respectfully requests that this Court:

a.      enter judgment in its favor;

b.      order Harris to turn over to Athenian in restitution the sums it unjustly retained; and

c.      award Athenian such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all claims so triable as of right.

- 15 -

February 28, 2005

Respectfully submitted,

EUROHOLDINGS CAPITAL & INVESTMENT CORP.,
f/k/a ATHENIAN CAPITAL HOLDINGS, S.A.

By One of Its Attorneys

Bruce S. Sperling
Thomas D. Brooks
Mona Arain
SPERLING & SLATER, P.C.
55 West Monroe
Suite 3200
Chicago, IL 60603
312-641-3200
312-641-6492 (fax)

- 16 -