# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EUROHOLDINGS CAPITAL & INVESTMENT CORP., | |
| Plaintiff, | No. 05 C 1181 |
| v. | Honorable Charles R. Norgle |
| HARRIS TRUST AND SAVINGS BANK, | |
| Defendant. | |

## ORDER AND OPINION

CHARLES R. NORGLE, District Judge

Before the Court is Defendant Harris Trust & Savings Bank's ("Harris") Motion for Summary Judgment and Counter-Plaintiff Harris' Motion for Summary Judgment on its counterclaims against Plaintiff and Counter-Defendant Euroholdings Capital & Investment Corp., f/k/a Athenian Capital Holdings, SA ("Athenian"). Because these motions arise from the same set of operative facts, the Court will decide them concurrently. For the following reasons, both motions are denied in their entirety.

## I. BACKGROUND

### A. FACTS

In June 1998 Harris (along with two other commercial lenders) entered into a loan agreement with LFG, LLC ("LFG") through which it agreed to loan LFG up to $13.5 million on a revolving basis. The parties built into the agreement a provision that subordinated LFG's previously-incurred debt to the prior payment of Harris' revolving loan. The parties further agreed that if LFG should incur any additional debt, LFG was to subordinate that additional debt

to the prior payment of Harris' revolving loan, or otherwise face termination of the parties' agreement.

In addition to serving as LFG's primary lender, Harris was also LFG's settlement bank, handling the daily transmission and receipt of funds to and from the various exchanges on which LFG did business. Harris also provided to LFG various bank accounts and lines of credit, including, as mentioned above, the $13.5 million revolving loan, through which LFG conducted its business. There is a general understanding that without a settlement bank at its side, LFG – a futures commission merchant and member of the Chicago Mercantile Exchange and Chicago Board of Trade – would be unable to clear trades for its customers and would likely be out of business.

In December 1999 Athenian entered into an agreement ("Purchase Agreement") to buy 90 percent of the equity of LFG. The Purchase Agreement provided that certain loans made to LFG from Athenian's chairman and his wife would be converted at closing into equity for Athenian in LFG. The Purchase Agreement anticipated the closing would take place on January 10, 2000. Prior to the closing date, LFG was required to fulfill several conditions in the Purchase Agreement. LFG, however, did not fulfill those conditions. By mid-December 1999 Harris became aware of Athenian's pending purchase of LFG and of the equity conversion of the loans made to the company.

In anticipation of the upcoming closing date, Harris extended the maturity date of its revolving loan with LFG to allow the parties adequate time for the closing. With this in mind, Athenian met with Harris on December 15, 1999, at which time Athenian reminded Harris of its Purchase Agreement with LFG and provided to Harris confidential information regarding Athenian's efforts to expand its futures and financial services business. At the same meeting,

Athenian asked Harris to continue serving as LFG's settlement bank and primary lender for at least some time after the closing. Harris acknowledged Athenian's request, but was concerned that Athenian would pursue other banking arrangements after the closing and that it would lose LFG's business as a result. Athenian contends that Harris could alleviate this risk if one of Harris' existing customers bought LFG instead of Athenian.

Athenian and LFG continued their preparations for closing and kept Harris informed of the purchase process. This continued through January and February of 2000. While the Athenian deal moved forward, Harris began to question its banking relationship with LFG. In early February Harris received a compliance certificate and a report indicating that LFG was not in compliance with several sections of one of the parties' loan agreements ("Commitment Agreement"). Harris also obtained information that the Chicago Mercantile Exchange was conducting an audit of LFG and had uncovered a series of financial irregularities that would reduce the company's regulatory capital by over $10 million. Harris concluded on or around February 14, 2000 that it would no longer extend the maturity date on its revolving loan to LFG.

Meanwhile, Athenian head, Paul Papadopoulos ("Papadopoulos"), and his wife, Stamatia Carras ("Carras"), made two loans to LFG in light of LFG's capital requirements for the upcoming Athenian acquisition. In early February Carras agreed to loan LFG $2 million in return for various amendments to the Purchase Agreement. Harris became aware of this loan and insisted that Carras submit a subordination letter to Harris before March 2, 2000. In late February, just after Harris concluded that it would stop serving as LFG's settlement bank, Papadopoulos wrote a $10 million check to Mark Vaughn ("Vaughn"), LFG's chief operating officer, confirming that Athenian intended to proceed with the acquisition. On the same day, Vaughn and Papadopoulos informed Harris of Athenian's $10 million loan to LFG. Harris

accepted this information, but did not disclose that it intended to withdraw as LFG's settlement bank and to pay down LFG's revolving loan debt with any funds that LFG was to receive. The additional funds, from both transactions, arrived in LFG's account on February 29, 2000.

The next day, on March 1, 2000, Harris contacted one of its customers, Refco Group Ltd., LLC ("Refco"), and advised that LFG was a potential acquisition opportunity. The parties disagree as to whether LFG instigated this communication. In any event, LFG and Refco met in early March to discuss the potential purchase. After this meeting, Refco undertook due diligence and, by March 14, Refco was poised to make an offer. On March 14, 2000 Harris contacted LFG and informed Vaughn that in three days, on Friday, March 17, 2000, Harris would cease serving as LFG's settlement bank. On the same day, Refco informed Vaughn that it would be sending a written purchase offer to LFG, which was scheduled to expire on Friday, March 17, 2000.

On March 15, 2000 LFG asked Harris to remain as its settlement bank. Instead of giving LFG an answer, Harris requested that LFG inform the bank of its decision to accept the Refco offer. LFG attempted to find another settlement bank to replace Harris. Yet, given the short notice and the lengthy process required for LFG to be approved by another settlement bank, LFG was unable to secure another bank. On March 16, 2000 Refco sent to Harris a copy of its written purchase offer to LFG. Harris reviewed the offer and inquired whether Refco intended to assume the leases on LFG's office space. Later that day, Harris sent a letter to LFG declaring it in default of the parties' Commitment Agreement and demanding that LFG repay the outstanding loan principal of $13.5 million and interest.

On March 17, 2000 Refco sent LFG a letter supplementing its initial purchase offer, which included, in accord with Harris' concerns, Refco's intent to assume LFG's leases for office space. The same day LFG agreed to the terms of Refco's purchase offer. The parties

4

memorialized Refco's purchase of LFG in an agreement dated April 5, 2000 with the purchase of LFG's customer accounts to close on or about May 1, 2000. At the closing, Refco took control of much of LFG's assets, informing LFG that it intended to refund at a later date any assets or funds that it was not entitled to under their agreement.

On or about April 3, 2000, realizing that they had been passed over on the LFG sale, Athenian, Papadopoulos and Carras entered into an agreement (the "April 3 Agreement") with LFG consenting to Refco's purchase of LFG in return for prepayment of their previous loans made to LFG. That agreement required LFG to pay Athenian, Papadopoulos and Carras $10 million at the closing of the LFG and Refco sale, and granted those parties security interests in various LFG assets to secure any outstanding debt. Athenian, Papadopoulos and Carras additionally entered into an agreement with Refco that required Refco to pay them $1 million upon the closing of the LFG and Refco sale. Refco paid those parties $1 million pursuant to that agreement.

Within a few days of the closing, Refco informed Harris that it planned to deposit $2.5 million into LFG's house account at Harris, which already contained approximately $3 million. When the money arrived, Harris deducted $5 million from LFG's house account and applied it to Harris' revolving loan. On May 12, 2000 Refco again informed Harris that it planned to deposit $8.5 million into LFG's house account at Harris. As soon as the money arrived, Harris deducted $8.5 million from LFG's house account and used it to pay down the Harris revolving loan in full. Because LFG did not have adequate funds in its house account at Harris, it was unable to pay back its loans from Athenian, Papadopoulos and Carras, as set forth in the April 3 Agreement. LFG liquidated its assets and ultimately filed for bankruptcy, with approximately $23 million owed to Athenian. Refco paid Harris $250,000 in return for suggesting the purchase of LFG.

B. PROCEDURAL HISTORY

Athenian, now Euroholdings, filed a six-count complaint against Harris relating to the parties' respective dealings with LFG. Athenian asserts claims for tortious interference with contract and/or business relations (Count I), breach of fiduciary duty (Count II), fraud (Count III), tortious interference with contract (Count IV), conspiracy (Count V) and unjust enrichment (Count VI). Harris, in turn, answered the complaint and brought four counterclaims against Athenian, seeking declaratory relief (Count I), and alleging claims for breach of contract (Count II), tortious interference with contract (Count III) and unjust enrichment (Count IV). Harris moved for summary judgment on all counts of Athenian's Complaint and for summary judgment on Counts I, II and III of its counterclaims against Athenian. The motions are fully briefed and now before the Court.

## II. DISCUSSION

A. STANDARD OF DECISION

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. DEFENDANT HARRIS' MOTION FOR SUMMARY JUDGMENT

### 1. Count I – Tortious Interference with Contract and/or Business Expectancy

Count I, in essence, alleged that Harris tortiously interfered with the LFG-Athenian Purchase Agreement, or with Athenian's expectancy to enter into the Purchase Agreement by inducing Refco to purchase LFG in its place. To establish the elements of a claim for tortious interference with contract, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) the defendant's awareness of the contract; (3) the defendant's intentional inducement of a breach of the contract; (4) a subsequent breach by a third party as a result of defendant's conduct; and (5) damages resulting from the breach. Burrell v. City of Mattoon, 378 F.3d 642, 652 (7th Cir. 2004). To establish a claim for tortious interference with a business expectancy, a plaintiff must show: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant knowledge of plaintiff's expectancy; (3) purposeful

7

interference by the defendant that prevents the plaintiff's fulfillment of that expectancy; and (4) damages to the plaintiff as a result of defendant's interference. Kempner Mobile Elec., Inc. v. S.W. Bell Mobile Sys., 428 F.3d 706, 716 (7th Cir. 2005). In this instance, issues remain as to the enforceability of the LFG-Athenian Purchase Agreement and as to Harris' conduct in contacting Refco regarding the potential purchase of LFG.

Again, LFG did not complete the conditions in the Purchase Agreement it entered into with Athenian. In light of this fact, Harris maintains that the Purchase Agreement was not an enforceable contract, and thus it could not have tortiously interfered with that contract. Athenian, on the other hand, maintains that the Purchase Agreement was enforceable, citing the contract's waiver provision through which Athenian envisioned that it could waive satisfaction of any conditions and still proceed to close the deal. Athenian further asserts that Harris' interference caused LFG's failure to fulfill the conditions in the Purchase Agreement, and thus LFG's failure to fulfill those conditions should not preclude a claim against Harris for interference with a contract.

A central question remains as to whether the conditions contained in the LFG-Athenian Purchase Agreement were material to that agreement, so that a failure to fulfill those conditions invalidated the parties' contract. If this were the case, then we must decide for Harris on Count I. But the issue of materiality is a question of fact that this Court cannot decide. See Comark Merchandising, Inc. v. Highland Group, Inc., 932 F.2d 1196, 1203 n.8 (7th Cir. 1991) (noting that whether an additional term constitutes a "material alteration" is a question of fact); see also Allied Elevator, Inc. v. E. Tex. State Bank of Buna, 965 F.2d 34, 38 (5th Cir. 1992) (holding that a question of fact exists when determining the materiality of a provision added to an insurance policy). A jury could reasonably find that the conditions set forth in the Purchase Agreement

were immaterial to the deal, given the waiver provision included in the agreement, Athenian's conduct as to those conditions and the open question of whether the conditions would have posed any obstacle to closing. If a jury were to find the conditions immaterial, the contract may be enforceable despite LFG's failure to fulfill those conditions. As such, an issue remains as to the materiality of the terms and conditions of the LFG-Athenian Purchase Agreement.

Moreover, there remains the additional issue of whether Harris intentionally interfered with the Purchase Agreement, or with Athenian's expectancy to enter into the Purchase Agreement with LFG. On this point Harris maintains that its actions – contacting Refco about a possible deal and abruptly declining to serve as LFG's settlement bank – were justified, in that they did not involve fraud, deceit or deliberate disparagement, and thus they could not give rise to liability for tortious interference.

Athenian, however, argues that Harris' conduct supports a claim for tortious liability for several reasons. First, Athenian asserts that Harris was less than candid when it contacted LFG about the possibility of talking to another potential buyer. For instance, Athenian points out that Harris failed to inform LFG that it intended to cease serving as LFG's settlement bank and that it planned to withdraw funds from LFG's bank accounts to pay down the revolving loan as soon as Refco consummated the deal. Second, Athenian highlights the "heavy-handed tactics" that Harris used to induce LFG into breaking its deal with Athenian and selling instead to Refco. And, based on these tactics, Athenian argues that a reasonable jury could find that LFG operated under duress when it entered the agreement with Refco. We agree with Athenian.

We are faced, then, with two competing inferences drawn from the facts asserted by each of the parties. On one hand, when considering Harris' conduct and the circumstances surrounding the parties' dealings, a reasonable jury could find that Harris' conduct was entirely

justified when it approached Refco about purchasing LFG. On the other, a reasonable jury could find just the opposite – that Harris intentionally interfered with the Athenian-LFG Purchase Agreement when it failed to disclose to LFG its intention to withdraw as LFG's settlement bank, and, upon disclosing its intention, when it set the deadline to withdraw on the same day that Refco's purchase offer expired. In light of these competing inferences, this Court finds that a genuine issue of fact exists and thus declines to decide the issue on summary judgment. E.g., Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996) ("On summary judgment, a court can neither make a credibility determination nor choose between competing inferences. Rather, these are functions for a jury."); see Church of Scientology Int'l v. Eli Lily & Co., 848 F.Supp. 1018, 1029-30 (D.D.C. 1994) (denying motion for summary judgment where increasing economic pressure exerted by defendant raised fact issue for tortious interference claim). Summary judgment is denied as to Count I.

### 2. *Count II – Breach of Fiduciary Duty*

Count II alleges that Harris breached its fiduciary duty to Athenian when it allegedly used the circumstances of the LFG purchase to its own advantage. Specifically, Athenian argues that Harris breached its fiduciary duty when Harris thwarted Athenian's purchase of LFG so that LFG could remain at Harris and to ensure that at least $10 million remained in LFG's account for withdrawal and payment of Harris' revolving loan. Harris contends that Athenian's claim fails because Harris did not owe any fiduciary duties to Athenian. This is the only issue before this Court.

To sustain a claim for breach of fiduciary duty, a plaintiff must demonstrate that a fiduciary relationship existed between it and the defendant, that the relationship gave rise to certain fiduciary duties on behalf of the defendant, and that the defendant breached those

fiduciary duties. In Illinois, fiduciary relationships can arise in two different ways. Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992). First, certain relationships give rise to a fiduciary duty as a matter of law. Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co., 376 F.3d 664, 672 (7th Cir. 2004); Pommier v. Peoples Bank Marycrest, 967 F.2d 1115, 1119 (N.D. Ill. 1999). Otherwise, a fiduciary relationship may exist under special circumstances, such as where one party confers trust and confidence in another, who, as a result, gains influence and superiority over the other. Burdett, 957 F.2d at 1351; Polansky v. Anderson, No. 04 C 3526, 2007 WL 4162807, at *6 (N.D. Ill. Nov. 20, 2007) (citing Foodcomm Int'l v. Barry, 463 F. Supp. 2d 818, 827 (N.D. Ill. 2004)).

Here, we are faced with the following facts. Harris knew of Athenian's loan to LFG. Harris failed to inform Athenian of LFG's questionable finances. Harris failed to inform Athenian that it intended to withdraw as LFG's settlement bank and primary lender. Athenian and its officers nevertheless loaned money to LFG. Harris informed Refco, a current customer, of the possible purchase of LFG. Refco issued LFG a purchase proposal. Harris threatened to withdraw as LFG's settlement bank on the same day that Refco's purchase proposal was set to expire. LFG was unable to secure another settlement bank. Refco purchased LFG, took control of its assets and returned various funds to LFG's account at Harris. Harris withdrew those funds and paid down its own revolving loan to LFG. Athenian and its officers lost the value of their loans to LFG.

This is a unique situation to say the least. We cannot say for certain that Athenian's relationship with Harris did not give rise to any fiduciary duties. Indeed, in light of Harris' position as LFG's settlement bank and primary lender, Harris was privy to information that perhaps it should have disclosed to Athenian, before Athenian made such a large loan to LFG.

Based on these facts, viewed in the light most favorable to the non-moving party, a jury could reasonably find the existence of a fiduciary relationship between Athenian and Harris. See Morris v. Resolution Trust Corp., 622 A.2d 708, 710-13 (Me. 1993) (finding fiduciary relationship where plaintiff trusted bank's superior knowledge of its debtor, and bank induced plaintiff to disburse funds to debtor). As such, we decline to speculate on the existence of a fiduciary relationship on a motion for summary judgment. The motion is denied as to Count II.

### 3. *Count III – Fraud*

A fraud "may consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak." Athey Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 435 (7th Cir. 1996). Such a duty may arise through a fiduciary or special relationship. Id. (recognizing the requirement that a duty exist for an intentional omission). Count III alleges that Harris perpetrated a fraud on Athenian when it failed to tell Athenian that it intended to stop serving as LFG's primary lender or settlement bank, thus inducing Athenian to loan LFG several million dollars. In response, Harris asserts that it, once again, had no duty to disclose to Athenian its intention to withdraw as LFG's settlement bank and primary lender.

While we agree with Harris that a lender generally owes no duty to third parties to warn of a customer's insolvency, a reasonable jury may find, under these circumstances, that Harris owed Athenian a duty to disclose its intention to withdraw as LFG's settlement bank and primary lender. Without a settlement bank, it is uncontested that LFG could not stay in business. It follows, then, that Athenian would have no interest or reason to loan money to a useless, inoperable company. It is one thing for a bank's customer to be insolvent, but it is quite another for a bank to undertake conduct that will contribute to its customer's insolvency. In this situation, a reasonable jury could find that special circumstances existed, which placed a duty

upon Harris to disclose LFG's situation to Athenian. Accordingly, summary judgment is denied as to Count III.

### 4. Count IV – Tortious Interference with Contract

Count IV alleges that Harris tortiously interfered with the April 3 Agreement between Athenian and LFG. Harris maintains, first, that it was unaware of the April 3 Agreement, and thus could not have interfered with that agreement. Second, Harris argues that any loans made to LFG were subject to subordination agreements, which required LFG to pay down Harris' revolving loan before any other subsequent loans. In this way, Harris maintains that its "actions in securing repayment were plainly justified."

Athenian, in response, asserts that Harris cannot rely on the subordination agreements because Athenian would not have loaned LFG over $12 million had it known of Harris' intent to stop serving as LFG's settlement bank. Athenian further maintains that its loans to LFG were to be subordinated only until the closing of the LFG-Athenian Purchase Agreement, which never took place because of Harris' alleged conduct.

A few issues remain outstanding on these points. First, the parties contradict each other with regard to Harris' knowledge of the April 3 Agreement. Harris expressly refers to the April 3 Agreement as a "secret deal" between Athenian, LFG, Refco and others. Athenian, on the other hand, states that Harris was aware of the April 3 Agreement "no later than May 11, 2000." As such, we find that a genuine issue of fact exists as to Harris' knowledge of the April 3 Agreement for purposes of Athenian's tortious interference claim in Count IV.

We also find that a genuine issue of fact exists regarding the circumstances of Athenian's $10 million loan to LFG and the related subordination agreements. A reasonable jury could indeed find that Athenian would not have loaned LFG $10 million and entered into the

13

subordination agreements had it known of Harris' intention to stop serving as LFG's settlement bank and primary lender. With such a finding, Harris could not rely on the subordination agreements to justify the payment of its revolving loan over Athenian's two, subsequent loans to LFG. Summary judgment is denied as to Count IV.

### 5. *Count V – Conspiracy*

Count V alleges that Harris and Refco conspired to divert funds to Harris otherwise due to Athenian. For a civil conspiracy, there must be: (1) an agreement between two or more persons for the purpose of accomplishing an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff. Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 508-09 (7th Cir. 2007). The agreement element is necessary to maintain a claim for conspiracy. Id. (citing McClure v. Owens Corning Fiberglass Corp., 720 N.E.2d 242, 258 (Ill. 1999)). The agreement to conspire may be expressed or implied. Scherer v. Balkema, 840 F.2d 437, 442 (7th Cir. 1998). An "agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." Id. (citing Green v. Benden, 281 F.3d 661, 665-66 (7th Cir. 2002)). A defendant who innocently performs an act, which furthers the tortious purpose of another is not liable for civil conspiracy. McClure, 720 N.E.2d at 258.

Harris challenges the conspiracy claim on two grounds. First, Harris argues that Athenian failed to submit any evidence that Harris or Refco committed an unlawful act. Second, Harris maintains that the record contains no facts to show that an agreement existed between Harris and Refco. We disagree with both challenges. As we have already explained, several

issues exist as to whether Harris committed the tortious conduct against Athenian. Such conduct may serve as the predicate act required for the conspiracy. The only issue remaining then is whether an agreement existed in furtherance of Harris' alleged tortious conduct. To that end, we find that Athenian has presented an assortment of circumstantial evidence from which a reasonable jury could infer that an agreement existed between Harris and Refco, who, in turn, had an understanding to achieve the conspiracy's objectives.

For instance, Athenian presented evidence that Harris contacted Refco, a current customer, regarding the purchase of LFG, when it knew that Athenian was entering into the same deal. Athenian also showed that Refco sought Harris' advice on the purchase agreement it would eventually submit to LFG. In the same vein, Harris sought to withdraw as LFG's settlement bank on the same day that the Refco purchase offer was set to expire. After the LFG purchase, Refco made phone calls to Harris before it deposited substantial funds into LFG's house account, which Harris would eventually withdraw to pay down its own loan to LFG. Finally, Refco paid Harris $250,000 in return for suggesting the LFG purchase. A jury could reasonably find an agreement existed between Harris and Refco given these facts. Summary judgment is therefore denied as to Count V.

### 6. *Count VI – Unjust Enrichment*

Count VI alleges that Harris was unjustly enriched when it received the funds from LFG's account that otherwise would have gone to Athenian pursuant to the April 3 Agreement. The essence of a claim for unjust enrichment is that one party has received a benefit unfairly and that it would be unjust to allow the recipient to retain the enrichment of that benefit. Dames & Moore v. Baxter & Woodman, Inc., 21 F. Supp. 2d 817, 827 (N.D. Ill. 1998). Here, Harris argues that Athenian's claim for unjust enrichment is barred because the doctrine has no

application where a contract governs the relationship in question. See Thorogood v. Sears Roebuck & Co., No. 06 C 1999, 2006 WL 3302640, at *5 (N.D. Ill. Nov. 9, 2006); People ex. Rel. Hartigan, 607 N.E.2d 165, 177 (Ill. 1992). While we agree with the Harris' legal proposition, it has no bearing on Athenian's claim for unjust enrichment. Again, Athenian claims that Harris orchestrated a scheme through which it withdrew funds from LFG's account, to Athenian's detriment, which would not have existed but for Harris' nondisclosure. A reasonable jury could certainly reach the conclusion that Harris was unjustly enriched on the facts presented. As such, summary judgment is denied as to Count VI.

## C. COUNTER-PLAINTIFF HARRIS' MOTION FOR SUMMARY JUDGMENT

### 1. Count – Declaratory Judgment

Through Count I, Harris seeks a declaratory judgment as to three propositions: (1) that Athenian's receipt of $1.2 million from Refco breached a subordination letter agreement and a junior subordinated debt agreement that Harris entered into with Athenian; (2) that Athenian's loans to LFG were subordinated to Harris' revolving loan; and (3) that the April 3 Agreement between Athenian and LFG was unenforceable. Athenian, in response, asserts that Harris is barred from enforcing any subordination agreements it entered into with Athenian, because it caused Athenian to make its loan to LFG via fraudulent means. As set forth above, an issue remains as to Harris' inducement of Athenian to make a $10 million loan to LFG, while subsequently protecting itself through a subordination agreement. If, in fact, a jury finds that Harris engaged in fraudulent conduct in causing Athenian to make the loan to LFG, we agree with Athenian that Harris would be precluded from enforcing the subordination agreement that flowed from Athenian's loan. See Havoco of America, Ltd. v. Sumitomo Corp., 971 F.2d 1332, 1341 (7th Cir. 1992) ("A [contract] may be set aside if there is fraud in the inducement").

Athenian has presented sufficient evidence for a reasonable jury to decide this issue. Summary judgment is denied as to Count I.

### 2. *Count II – Breach of Contract*

Count II claims that Athenian breached the subordination agreement it entered into with Harris after it made the $10 million loan to LFG. Our reasons for denying summary judgment as to Count II are the same as those supporting a denial of summary judgment as to Count I. Summary judgment is denied as to Count II.

### 3. *Count III – Tortious Interference with Contract*

Count III alleges that Athenian tortiously interfered with Harris' two contracts it had with LFG. The validity of those contracts is not at issue. Harris' contracts with LFG subordinated any debt incurred by LFG before and after Harris made its $12 million revolving loan to LFG. Stated another way, through these contracts Harris' loan became senior to any and all other loans made to LFG. As such, Harris alleges that Athenian interfered with these contracts when it entered into the April 3 Agreement with LFG, which required LFG to pay back the Athenian loan prior to making payments on Harris' revolving loan.

Athenian, in response, asserts that Harris was not only aware of the April 3 Agreement, but even suggested that Athenian enter an agreement with LFG regarding the liquidation of LFG's assets and the collection of Athenian's debts. Indeed, Athenian points out that Harris made this suggestion despite the existence of its contracts with LFG. Thus, when Harris did so, it waived any claims that Athenian's loan was subordinated to Harris' interest in LFG's assets.

In Illinois, a waiver requires the voluntary and intentional relinquishment of a known right. PPM Finance, Inc. v. Norandal USA Inc., 297 F. Supp. 2d 1072, 1087 (N.D. Ill. 2004). A party seeking to establish a waiver must offer clear and convincing evidence of such a waiver.

17

See id. at 1087. In support of its waiver claim, Athenian offered a statement by Harris' counsel suggesting that Athenian enter an agreement with LFG to collect its debts, and that Harris would not impede Athenian's efforts to do so. Harris, however, contends that this statement was not meant, in any conceivable way, to waive Harris' senior rights to repayment. Given the statement by Harris' counsel, and the context of the letter in which it appeared, a jury can reasonably find for either party on this issue. An inference of waiver is a reasonable one, but this is for the jury to decide. Summary judgment is denied as to Count III.

## III. CONCLUSION

For the reasons stated above, Defendant Harris' Motion for Summary Judgment and Counter-Plaintiff Harris' Motion for Summary Judgment on its counterclaims against Plaintiff and Counter-Defendant Euroholdings Capital & Investment Corp., f/k/a Athenian Capital Holdings, SA are denied.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: 3-18-08