IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUROHOLDINGS CAPITAL & )
INVESTMENT CORP., f/k/a )
ATHENIAN CAPITAL HOLDINGS, )
S.A., )
      Plaintiff, )
            )
      v. )    **Case No. 05 C 1181**
            )
HARRIS TRUST & SAVINGS BANK, )    **Magistrate Judge Morton Denlow**
      Defendant. )
            )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on seven motions *in limine* filed by Plaintiff

Euroholdings Capital & Investment Corp., f/k/a Athenian Capital Holdings, S.A. ("Plaintiff"

or "Euroholdings") and on seven motions *in limine* filed by Harris Trust & Saving Bank

("Defendant" or "Harris Bank"). Euroholdings' motions *in limine* seek to exclude the

testimony of three expert witnesses; to bar attorney-witnesses from acting as advocates at

trial or, in the alternative, to disqualify counsel; to preclude mention of the Greek Capital

Markets Committee investigation and related maters; to exclude Harris Bank's purported

defense under the Illinois Credit Agreements Act; and to deem certain material facts not

genuinely at issue.

Harris Bank's motions *in limine* seek to prevent Euroholdings from offering damages

evidence; to exclude the testimony of one expert; to exclude the testimony of one witness in

its case-in-chief; to prevent Euroholdings from offering prejudicial evidence concerning Harris Bank's parent company; to prevent Euroholdings from offering prejudicial evidence concerning the contact of the experts with lawyers for the opposing party; to bar Euroholdings from contesting facts it has admitted; and to disallow Euroholdings from making arguments concerning duties at odds with Illinois law.

These motions were referred by District Court Judge Charles R. Norgle, Sr. for resolution pursuant to 28 U.S.C. § 636(b)(1). This Court held oral argument on January 15, 2009. At that time, the Court ruled upon all of the parties' motions *in limine*, with the exception of Harris Bank's first motion *in limine*, which seeks to prevent Euroholdings from offering certain damages evidence. Dkt. 159.[1] Harris Bank's first motion *in limine* is the subject of this Memorandum Opinion and Order. For the reasons stated below, this Court grants in part and denies in part Harris Bank's first motion *in limine*.

## I. BACKGROUND FACTS

Euroholdings filed this lawsuit on February 28, 2005 alleging: (1) tortious interference with contract and/or business relations; (2) breach of fiduciary duty; (3) fraud; (4) tortious interference with contract; (5) conspiracy; and (6) unjust enrichment. Dkt. 1.

This case involves Euroholdings' and Harris Bank's respective relationships with LFG, LLC ("LFG").[2] In June 1998, Harris Bank entered into a loan agreement with LFG,

---

[1]Dkt. ___ refers to docket entries in this case.

[2]For purposes of this motion, the Court relies upon the facts as set forth in Judge Norgle's March 18, 2008 Order and Opinion denying the parties' cross-motions for summary judgment, as well as in the

LLC ("LFG"), a futures commission merchant doing business in Chicago, through which it agreed to loan funds to LFG. Specifically, pursuant to this agreement, LFG had an arrangement with Harris Bank, CommerzBank AG, and Cole Taylor Bank ("Senior Lenders") wherein LFG could borrow up to $8.5 million in loans from Harris Bank, and could borrow up to $13.5 million from the Senior Lenders collectively ("Harris Loan Agreement"). The funds under the agreement qualified as regulatory capital for LFG. In about January 2000, Harris Bank extended the maturity date of the Harris Loan Agreement to August 31, 2000. Harris Bank also served as a settlement bank for LFG, and was thereby authorized to conduct cash and securities settlements relating to trades. In addition, Harris provided to LFG bank accounts and lines of credit, including LFG's main operating account.

In December 1999, Euroholdings entered into an agreement to purchase 90 percent of the equity in LFG. Euroholdings also acquired 25 percent of the capital stock, and thereby became the largest shareholder, of Union plc ("Union"), which was involved in the business of brokering futures. After acquiring the Union stock, Athenian also entered into an agreement to acquire Union's bank subsidiary, Union Discount. During 1999 and 2000, Euroholdings and its individual employees lent LFG millions of dollars in anticipation of the acquisition. The agreement anticipated the closing would occur on January 10, 2000, but LFG failed to fulfill the conditions in the agreement prior to that date. By December 1999,

parties' briefs. Judge Norgle's March 18, 2008 Order and Opinion is Dkt. 120. Harris Bank's memorandum in support of its motions *in limine* is Dkt. 146. Euroholdings' motion *in limine* is Dkt. 138.

Harris Bank was aware of Euroholdings' negotiation to purchase 90 percent of the equity in LFG.

In December 1999 and January 2000, Harris Bank extended the maturity date of its revolving loan with LFG to allow Euroholdings and LFG adequate time for the January 2000 closing. On December 15, 1999, Euroholdings met with Harris Bank, at which time Euroholdings reminded Harris Bank of its purchase agreement with LFG; provided to Harris Bank confidential information regarding its efforts to expand its business; and asked Harris Bank to continue to serve as LFG's settlement bank for at least some time after the January 2000 closing. Harris Bank recognized Euroholdings' request, but was concerned Euroholdings would seek alternate banking arrangements following the closing with LFG.

In about February 2000, Harris Bank learned LFG was not in compliance with several sections of one of the loan agreements and decided it would no longer extend the maturity date on its revolving loan to LFG. At this time, Harris Bank was aware Euroholdings and its individual employees lent LFG millions of dollars in anticipation of the acquisition, but Harris Bank did not disclose that it intended to withdraw as LFG's settlement bank.

Also in February 2000, Harris Bank suggested that its customer Refco explore a possible business opportunity with LFG. On about March 14, 2000, Refco sent a written letter to LFG with an offer to purchase most of LFG's assets, with an expiration deadline of March 17, 2000. On about March 16, 2000, Harris Bank sent a letter to LFG notifying it that it was in default under the Harris Loan Agreement, and demanding that the outstanding

4

principal of $12.5 million plus interest be paid by August 31, 2000. Harris Bank also notified LFG around this time that it would cease serving as its settlement bank. On March 15, 2000, LFG asked Harris Bank to continue to serve as its settlement bank. Harris Bank asked LFG whether it was planning to accept the Refco offer. LFG worked to find a replacement settlement bank, but was unable to do so on short notice. On March 16, 2000, Refco sent a copy of its purchase offer to Harris Bank, which subsequently sent a letter to LFG declaring it in default of its loan agreement and demanding LFG repay the outstanding loan principal of $13.5 million and interest.

On or about March 17, 2000, LFG accepted Refco's purchase offer. Refco subsequently assumed control of much of LFG's assets. On or about April 3, 2000, Euroholdings entered into an agreement with LFG consenting to Refco's purchase of LFG in exchange for prepayment of its previous loans to LFG. The agreement obligated LFG to pay Euroholdings $10 million at the closing of the LFG and Refco sale, and granted Euroholdings security interests in various LFG assets. An agreement between Euroholdings and Refco provided that Refco would pay Euroholdings $1 million upon the closing; Refco fulfilled this obligation.

Shortly before the closing of the LFG and Refco sale, Refco informed Harris Bank that it planned to deposit $2.5 million into LFG's account at Harris Bank, which already contained approximately $3 million. Harris deducted $5 million from LFG's account after Refco made its deposit and applied it to Harris Bank's revolving loan with LFG. On May

12, 2000, Refco notified Harris Bank of its plan to deposit $8.5 million into LFG's account, and Harris Bank deducted that amount from the account as soon as the money was deposited. Harris Bank used those sums to pay down the revolving loan to LFG in full. As a result, LFG lacked funds in its account and was unable to repay its loans from Euroholdings and its individual employees, in violation of its agreement. Ultimately, LFG filed for bankruptcy, owing approximately $23 million to Euroholdings.

## II. LEGAL STANDARDS

This Court will discuss the applicable motion *in limine* legal standard, and will then apply it and the specific legal standards to Harris Bank's first motion *in limine*.

### A.    Motions *in Limine*

A motion *in limine* is a request for the court's guidance concerning an evidentiary question. *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999); *Kiswani v. Phoenix Security Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008). The Court may give such guidance by issuing a preliminary ruling regarding admissibility. *Wilson,* 182 F.3d at 571. Trial judges are authorized to rule on motions *in limine* pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). Judges have broad discretion when ruling on motions *in limine. Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). However, evidence may be excluded on a motion *in limine* only when the evidence is inadmissible on all potential grounds. *Townsend v. Benya*, 287 F.Supp.2d, 868, 872 (N.D.

6

Ill. 2003). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F.Supp 1398, 1400 (N.D. Ill. 1993). Thus, the party moving to exclude evidence *in limine* has the burden of establishing that the evidence is not admissible for any purpose. *Robenhorst v. Dematic Corp.*, 2008 WL 1821519, at *3 (N.D. Ill. April 22, 2008).

Denial of a motion *in limine* does not mean that all evidence contemplated by the motion will be admitted at trial. *Hawthorne*, 831 F.Supp. at 1401. Rather, denial means the court cannot determine whether the evidence in question should be excluded outside of the trial context. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989). A ruling on a motion *in limine* is not necessarily final. *Townsend*, 287 F.Supp.2d at 872. "The ruling is subject to change when the case unfolds," particularly if the actual testimony differs from what was proffered. *Luce,* 469 U.S. at 41. "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id.* at 41-42.

## B.    Admissibility of Expert Testimony

The legal standard for the admission of expert testimony is well-established in the Seventh Circuit. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court stated a district court has a "gatekeeping role" of ensuring that an expert's testimony is both reliable and relevant. 509 U.S. 579, 597 (1993). In the Seventh Circuit, the principles set

forth in *Daubert* and Rule 702 of the Federal Rules of Evidence ("Rule 702") govern the admission of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 requires that expert testimony satisfy the following standard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Preliminary questions concerning the qualifications of an expert witness or the admissibility of evidence are determined by the court. Fed. R. Evid. 104(a).

The party that proffers an expert's testimony bears the burden, by a preponderance of the evidence, of establishing its admissibility. *Dukes v. Illinois Cent. R. Co.*, 934 F. Supp. 939, 946 (N.D. Ill. 1996). "The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)).

In applying Rule 702, courts undertake a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and the testimony must assist the trier of fact to

8

understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *Ervin*, 492 F.3d at 904.

*Daubert* sets forth the following non-exhaustive list of guideposts to use to determine reliability: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community. *Ervin*, 492 F.3d at 904; *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718). Furthermore, the inquiry envisioned by Rule 702 is a flexible one. *Daubert*, 509 U.S. at 594; *Winters*, 498 F.3d at 742.

## III. DISCUSSION

Defendant seeks to exclude the damages calculations made by Plaintiff's expert, Paul Charnetzki ("Charnetzki"). Specifically, Defendant moves for the exclusion of any evidence concerning "lost profits" arising out of Euroholdings' failed efforts to purchase 90 percent of LFG, as described in Charnetzki's expert report; any evidence concerning Euroholdings' alleged Union losses, including thirty exhibits related to Union; and any evidence concerning prejudgment interest alleged to be due to Euroholdings. Each of these issues will be

9

addressed in order.

## A.    Lost Profits and New Business Rule

When seeking recovery of lost profits under Illinois law, the lost profits must be established with a reasonable degree of certainty and be traceable to defendant's wrongful conduct. *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 633 (7th Cir. 2007) (applying Illinois law); *Kiswani*, 247 F.R.D. at 558 (same). In such cases, the claimant bears the burden of establishing the lost profits with "reasonable certainty." *TAS Distrib. Co., Inc.*, 491 F.3d at 631-32.  If a party establishes it is entitled to damages, but is unable to prove those damages with a reasonable degree of certainty, it may only recover nominal damages awarded at the discretion of the trial judge. *Id.* at 632. Although lost profits are prospective in nature and inherently uncertain, a party must provide evidence which establishes a reasonable basis for computing them. *Id.* at 632-33. A party must also show that the damages can be traced to the defendant's wrongful conduct with a reasonable degree of certainty. *Id.*

Furthermore, the "new business rule" typically bars recovery for lost profits of a new business as "too uncertain, specific and remote to permit recovery." *Id.* at 633. As a general rule, a new business has no right to recover lost profits because it has yet to demonstrate what its profits will be. *Id.* at 633-34; *Stuart Park Assoc. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995) (applying Illinois law and affirming trial court's decision to exclude evidence of lost profits in light of the plaintiff's status as a new and unproven

10

venture). Thus, lost profits are normally recoverable only when a business was previously

established. *Stuart Park Assoc. Ltd. P'ship*, 51 F.3d at 1328; *Kiswani*, 247 F.R.D. at 559.

Prior success with a similar business generally does not provide ample information to

calculate lost profits for a new business because conditions vary with each business venture.

*TAS Distrib. Co., Inc.*, 491 F.3d at 635; *Kiswani*, 247 F.R.D. at 559. The purpose of the

Illinois new business rule is "to limit the speculative element in estimating lost profits." *BEM

I L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 555 (7th Cir. 2002).

Still, lost profits need not be proven with absolute certainty. *TAS Distributing Co.,

Inc.*, 491 F.3d at 633 (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770

N.E.2d 177, 199 (2002)). Indeed, "because damages for lost profits are prospective, these

damages will be inherently uncertain and incapable of calculation with mathematical

precision." *TAS Distributing Co., Inc.*, 491 F.3d at 632-33. "A recovery may be had for

prospective profits when there are any criteria by which the probable profits can be estimated

with reasonable certainty." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d

61, 66 (Ill. 1987). A party generally must also "present competent proof of lost profits from

which a reasonable basis of computation can be derived." *TAS Distributing Co., Inc.*, 491

F.3d at 633-34 (citing *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 1000 (Ill. 1993)).

There have, in fact, been cases in which experts have provided convincing, non-

speculative evidence sufficient to prove lost profits. *See, e.g., Malatesta v. Leichter*, 542

N.E.2d 768, 781-784 (Ill. App. 1989) (finding the profits of a person other than plaintiff,

11

who operated a car dealership at the identical location, were not too speculative to prove damages to a plaintiff who was prevented from acquiring the dealership); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) (applying Illinois law and sustaining a seven-figure verdict based upon the financial experience of the owners of the Chicago Bulls professional basketball franchise for a ten-year period after the plaintiffs, who had never previously owned the franchise, were wrongfully precluded from acquiring it); *Rhodes v. Sigler*, 357 N.E. 2d 846 (Ill. App. 1976) (finding evidence of the profits of a person other than the plaintiff in the same period of time plaintiff was seeking damages provided the required degree of certainty).

In the cases involving new businesses in which the courts have allowed lost profits, the measure of damages has often been "comparable businesses" in the area. *TAS Distributing Co., Inc.*, 491 F.3d at 634. For example, Illinois courts have upheld damages awards based on comparable businesses where the "profits [are] of a person other than plaintiff, who operated the same established business at the identical location for the period of time which plaintiff seeks damages." *Id.* As the Seventh Circuit has explained, in applying this measure of damages, "the business used as a standard must be as nearly identical to the plaintiffs as possible." *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n.7 (7th Cir. 1979) ("In terms of reasonableness, then, the profits of closely comparable businesses are the second-best measure of consequential damages after a party's own track record"); *see also Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794,

12

812 (N.D. Ill. 2005). Additionally, the Seventh Circuit explained that in *Milex Products*, the Appellate Court of Illinois relied upon cases "in which experts have provided convincing and non-speculative evidence sufficient to prove lost profits, and where, as such, the general rule that lost profits are not recoverable did not apply." *TAS Distributing Co., Inc.*, 491 F.3d at 633 (citing *Milex Products v. Alra Laboratories, Inc.*, 603 N.E.2d 1226, 1236-37 (Ill. App. 1992)).

In the case at hand, Harris Bank has moved to exclude all lost profits as calculated by Euroholdings expert Charnetzki. However, in accordance with the principles above, such an exclusion would be overly broad. "A recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty." *Tri-G, Inc. v. Burke, Bosselman & Weaver,* 856 N.E.2d 389, 406-07 (Ill. 2006). Here, Plaintiff has presented a reasonable method for the calculation of lost profits arising out of Euroholdings' failed efforts to purchase 90 percent of LFG. Moreover, these calculations with respect to LFG are based upon appropriate data. The evidence is grounded upon a reasonably certain set of facts and can be estimated with reasonable certainty. The reports of Plaintiff's expert openly identify reasonable assumptions that support his computations. They also acknowledge any limitations of the data, and set out several alternate scenarios for what profits may have been realized. Ultimately, these reports meet the "reasonable certainty" criteria for lost profits, and should not be excluded on a motion *in limine*.

13

Charnetzki's analysis provides the jury with an appropriate framework within which

it may consider the issue of damages. As a starting point, Charnetzki examined LFG's

actual performance as reflected in its financial reports. He removed proprietary trading

revenues from those financial reports to account for LFG's plans to eliminate its proprietary

trading business following its acquisition by Euroholdings. Charnetzki Report, ¶¶ 6.23-6.26.

As part of his effort to create a baseline LFG for the analysis, he also adjusted the

presentation of LFG's financial information to facilitate a comparison with other firms in the

industry. *Id.* Such efforts included breaking out LFG's gross revenues and fees paid to

introducing brokers. *Id.*

Charnetzki then created projections regarding how LFG would have performed if it

had been acquired by Euroholdings. Charnetzki expressly set forth specific assumptions and

the bases for them. For example, Charnetzki examined data including the characteristics of

LFG and industry volume growth. *See e.g.,* Charnetzki Report, ¶¶ 5.7, 6.29. In addition,

Charnetzki examined how LFG was positioned to capitalize upon the growth in the industry,

which was demonstrated by industry growth data. *See, e.g.,* Charnetzki Report, ¶¶ 6.9 and

nn.40, 42; 6.10 and n. 44. In creating projections of LFG's performance, Charnetzki used

reasonable financial and valuation methodology in gathering data from comparable publicly-

traded companies to deduce benchmarks from which to value LFG. *See, e.g.,* Charnetzki

Report, ¶¶ 6.31-6.33. Relying upon specific futures commissions merchants as comparables,

Charnetzki created benchmarks for performance drivers in the model, including average

commission per trade, segregated funds growth rates, revenue growth rates, and various expense categories. *See, e.g.,* Charnetzki Report, ¶¶ 6.7-6.11, 6.31-6.40, 6.42-6.47, 6.54-6.57, 6.60, 6.62-6.66. Charnetzki applied those benchmark drivers to LFG's actual performance in 1999. *Id.* at Appendix C. After he had calculated the cash flows LFG would have generated, Charnetzki discounted those cash flows to March 31, 2000, then adjusted the March 31, 2000 value to the date of his report. *Id.* at Appendix C-1.

Thus, Movant will have the opportunity to challenge Charnetzki's computations regarding LFG on cross-examination. The damages evidence pertaining specifically to Euroholdings' unconsummated acquisition of LFG shall not be excluded at this stage, and it may be challenged at trial. In sum, Defendant's motion to preclude Plaintiff from offering at trial any evidence regarding the "lost profits" analysis arising out of Euroholdings' failed efforts to purchase 90 percent of LFG, as described in Charnetzki's expert report, is denied.

However, the exhibits and any other evidence pertaining to the alleged Union losses should be excluded. This Court has carefully considered the parties' arguments and finds its recent decision in *Kiswani v. Phoenix Security Agency, Inc.* particularly instructive. *See* 247 F.R.D. 554 (N.D. Ill. 2008). In *Kiswani*, this Court granted the defendants' motion *in limine* to exclude evidence regarding the plaintiff's damages claim for lost profits because the claims were too speculative, were not supported by legal causation, and were barred by the new business rule. *Id.* at 559-561. In that civil rights case brought under 42 U.S.C. § 1983, the plaintiff was precluded from presenting evidence relating to four categories of economic

damages, including lost profits from two hotel deals and from the plaintiff's failed mortgage

company. *Id.* With respect to the hotel deals, the Court emphasized that numerous

contingencies could have caused the deals to fall through, noting that the deals did not have

the necessary licensing approvals at the time. *Id.* at 560. The plaintiff's claim for damages

relating to lost profits from his failed mortgage company was also barred in part because the

lost profits evidence was overly speculative. *Id.* Specifically, although the company was

incorporated, it was never granted a license by the State of Illinois and never opened for

business. *Id.* The Court rejected the plaintiff's argument that evidence including a business

proposal and his business partner's experience in running a similar company demonstrated

the company's future profits. *Id.* at 560 n.4.

Moreover, the three cases upon which Plaintiff relied during oral argument before this

Court are readily distinguishable. First, in *BEM 1 v. Anthropologie,* the Seventh Circuit

addressed an arbitration award based upon profits attained by a store in the identical highly

successful chain, noting that the purpose behind examining lost profits for a new store, which

is to limit the speculative element in estimating lost profits, may be inapplicable in a case

where the new store is an identical copy of the other stores in a highly successful chain. 301

F.3d at 555. Second, in *Milex Products*, the Illinois Appellate Court held that an existing

drug manufacturer was entitled to damages for lost profits, even though the product was a

new one, based on the sale of the same generic drug by a different company, which showed

the product had an established market. 603 N.E.2d at 1231-32. Third, in *JamSports and*

16

*Entertainment, LLC v. Paradama Productions, Inc.*, the court allowed the plaintiff bringing antitrust, tort and contract claims to present lost profits claims to the jury based on profits actually attained by a competitor who promoted the same product. No. 02 C 2298, 2004 WL 2966947, at *4-5 (N.D. Ill. Nov. 24, 2004).

Applying the principles set forth above, this Court concludes the analysis it recently conducted in the *Kiswani* case applies here, rendering excludable the evidence pertaining to the alleged Union losses. Although Euroholdings presents evidence, and emphasized at oral argument, that it had taken a "vast amount of steps . . . in order to implement its business plan" with respect to Union, this does not save its claim for lost profits damages related to Union. *See* Transcript of Proceedings, January 15, 2009, at 50:11-14. To the contrary, the facts associated with the alleged Union losses raise red flags akin to those that troubled this Court in *Kiswani*. Therefore, they compel the Court to reach the same conclusion as it reached in *Kiswani*. Here, faced with a business that was not even operating, this Court finds the damages evidence pertaining to Union is too speculative, is not supported by legal causation, and is barred by the new business rule. Not only could numerous contingencies have caused the Union acquisition to fall through, the damages evidence is overly speculative. Thus, any evidence concerning Euroholdings' alleged Union losses should be excluded where applicable, as such evidence is premised upon speculative predictions of what Union might become.

Unlike the lost profits evidence associated with LFG, the evidence related to alleged

17

Union losses fails to satisfy the requirements of Illinois law in that it is not grounded upon a reasonably certain basis of facts, is based upon mere projections, and cannot be estimated with reasonable certainty. Significantly, with respect to Union, Charnetzki assumed the performance would yield returns equivalent to an index he generated of investment banks despite acknowledging that neither Union plc nor Union Discount was in the investment banking business. Charnetzki Report, ¶¶ 6.85, 6.88-6.97; Charnetzki Dep. at 195:7-12; 196:23-197:6; 198:9-199:12; 204:16-205:5. Charnetzki relied upon Euroholdings' plans to create a boutique financial services firm using the clientele linked with Union. Dkt. 155, at 9. Charnetzki Report ¶¶ 5.3, 6.88-6.89. Such plans, at best, still amount to the type of purely speculative evidence this Court rejected in *Kiswani*. *See* 247 F.R.D. at 560 n.4 ("A proposal, however, is still based on speculation.") In sum, for the foregoing reasons, Defendant's motion to preclude Plaintiff from offering at trial any evidence regarding its alleged Union losses, including thirty exhibits related to Union, is granted.

## B.    Prejudgment Interest

Finally, Harris Bank further moves to exclude any evidence by Plaintiff regarding prejudgment interest, alleging that each of Charnetzki's damage scenarios involves a calculation of prejudgment interest purportedly recoverable by Euroholdings. *See, e.g.,* Charnetzki Report ¶¶ 6.75, 6.105, 6.116, 6.118, 6.125, 6.126. Harris Bank contends each of these calculations include prejudgment interest components that are not recoverable under Illinois law. Euroholdings asserts it is "not presently seeking a prejudgment interest award,"

but is instead "simply present-valuing its losses in order to arrive at an accurate compensatory damages figure, as is standard practice in computing lost profits." Dkt. 155, at 27. The Court agrees with Defendant that this material should be excluded because it constitutes prejudgment interest and not lost profits.

The law in this area is well-established in Illinois. Prejudgment interest is only recoverable through express agreement between the parties, or by statute. *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*, 644 F.2d 633, 638 (7th Cir. 1981) ("Air Crash"); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 411-412 (Ill. 2006); *Movitz v. First Nat'l Bank of Chi.*, 982 F. Supp. 566, 568 (N.D. Ill. 1997). In addition, in order to receive prejudgment interest under the Illinois Interest Act, codified at 815 ILCS 205/2 *et seq.*, damages must be "fixed and easily ascertainable," which is not the case with the damages before this Court. *Mutual Svc. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 628 (7th Cir. 2001); *First Nat'l Bank of LaGrange v. Lowrey*, 872 N.E.2d 447, 479-80 (Ill. App. 2007) (affirming denial of prejudgment interest and emphasizing that Illinois Interest Act applies only when there is "a fixed or easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument").

In this case, there is neither an agreement between Euroholdings and Harris concerning interest nor a statutory basis for such an award. While the Illinois Interest Act allows interest awards in specific instances, it does not permit prejudgment interest in lawsuits based upon tort claims. *Hawkins v. City of Chicago*, 1989 WL 10875, at *3 (N.D.

Ill. Feb. 3, 1989); *Matich v. Gerdes*, 550 N.E.2d 622, 631 (Ill. App. 1990). Moreover, the amounts on which Euroholdings would recover prejudgment interest are certainly not "fixed and easily ascertainable." As discussed in detail above, Euroholdings proffers various calculations of lost profits, which are not the type of damages on which prejudgment interest may be calculated. *Movitz*, 982 F. Supp. at 569-70 (denying prejudgment interest because damages were not fixed as evidenced by alternate damages theories and were subject to jury's discretion and judgment); *Alguire v. Walker*, 506 N.E.2d 1334, 1341 (Ill. App. 1987) (finding prejudgment interest should not have been awarded because damages amount was "hotly disputed" and citing submission of multiple damages scenarios as proof that amount owed was not fixed).

Although Euroholdings argues it is present-valuing its losses in order to arrive at an accurate compensatory damages figure, its own expert's report and analysis belie this contention. Indeed, in his report, Charnetzki repeatedly references prejudgment interest in explaining his methodology. *See, e.g.*, Charnetzki Report ¶ 6.75 (addressing "appropriate rate for prejudgment interest"); ¶ 6.126 (referencing $4.3 million loss "with prejudgment interest" resulting in $6.3 million in Union out-of-pocket losses); *see also* Charnetzki Report at App. C-1, C-2 (referencing an award of "damages" increased by interest). In light of how these "interest" components are used, it appears to the Court that these "interest" components are not merely components of "present value" calculations as Euroholdings argues. For example, a prejudgment interest component is featured in Charnetzki's "lost profit"

20

calculations, which assess the present value of a stream of income, as well as in his "out of pocket" loss calculations, which rely on a historical loss. *See* Charnetzki Report ¶¶ 6.125, 6.126.

Illinois law does not provide for prejudgment interest on tort or fraud claims. *See Needham v. White Laboratories, Inc.*, 847 F.2d 355, 361-62 (7th Cir. 1988) (citing Ill. Rev. Stat. Ch. 17, Para. 6402) (refusing to allow prejudgment interest in a tort case, noting plaintiff failed to cite authority for the proposition that Illinois courts would recognize a common law right to prejudgment interest in cases not covered by the statute, and explaining *Air Crash* constitutes some evidence that Illinois courts would not do so); *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1007 (7th Cir. 1989) (explaining Illinois courts are reluctant to "go beyond the statute," which "says nothing about fraud").

Moreover, the three cases upon which Euroholdings relies are readily distinguishable and also do not show an alleged "present value" calculation, which is a calculation of the value of a stream of future revenue, is exempt from the Illinois Interest Act. In *Lazzara v. Howard A. Esser, Inc.*, the Seventh Circuit held that interest owed to a plaintiff because of a defendant's conduct can be recoverable although prejudgment interest was not recoverable. 802 F.2d 260, 270-71 (7th Cir. 1986). Specifically, the court found an insurance broker breached his fiduciary obligation by failing to obtain coverage requested by the insured, and the broker was therefore liable for any interest for which the insured was liable under a third party's judgment. *Id.* This award, however, was not supportable as an award of prejudgment

21

interest, but instead as part of the damages plaintiff suffered as a result of the defendant's breach of duty. *Id.* at 270.

In *Vendo Co. v. Stoner*, the Illinois Supreme Court addressed an action for breach of non-competition covenants in sales and employment contracts. 321 N.E.2d 1, 13-14 (1974). Significantly, this decision contained no reference to interest; instead, the court addressed an award of profits lost between specified dates. *Id.* Finally, in *Air Crash*, the Seventh Circuit addressed a claim under the Illinois Wrongful Death Act. 644 F.2d at 640. This case distinguished between permissible present value calculations of past damages and impermissible calculations of prejudgment interest. The court noted that "if the correct measure of damages in a wrongful death case were present value at date of death rather than trial, any amount more than present value at date of death would have to be considered interest, rather than compensation, and therefore should not be allowed." *Id.* at 640. It found that the Act required the loss to be calculated not as of the date of death, but as the date of trial. *Id.* at 643. That alone allowed the calculation of loss as of the date of death to be brought current by means of an "interest" calculation. *Id.* Here, such an analysis is unnecessary because Charnetzki recognizes Euroholdings "lost" any expectation of profits it may have had in March 2000, rendering it permissible to calculate the loss as of that date. *See* Charnetzki Report ¶ 6.71 (assessing approximate date of damages as March 31, 2000). In other words, the value of Euroholdings' expectation can properly be calculated as of March 2000.

This Court also finds *Monetti v. Anchor Hocking Corporation* instructive. 1992 WL 67852 (N.D. Ill. Mar. 23, 1992) (not reported). In that case, the defendant asked the court to exclude evidence of lost sales profits in excess of minimum requirements allegedly set forth in the contract at issue. *Id.* at *1. The defendant objected to the plaintiff's introduction of any evidence on prejudgment interest as an element of damages in part because they were not readily ascertainable. *Id.* at *3. While the plaintiff claimed it did not seek prejudgment interest but rather the present value of its lost profits as of the date of trial, the court agreed with the defendant. *Id.* Specifically, the court admonished, "[c]alling prejudgment interest by another name, however, does not make the law less applicable." *Id.* The court could not discern a difference between the plaintiff's claim for present value and a claim for prejudgment interest; it emphasized that a component of the requested present value calculation was prejudgment interest. *Id.* Indeed, the court stressed that the plaintiff ignored the numerous cases which hold that prejudgment interest is not available on lost profits, noting that lost profits are "rarely determinable with enough precision . . . to merit prejudgment interest." *Id.* (collecting cases). In that case, the amount of profits was contested, was the center of battle of the experts, and was not subject to exact computation. Thus, the court found prejudgment interest on lost profits was not allowed and thereby excluded evidence on prejudgment interest separately or as a component of present value. *Id.*

23

Finally, Euroholdings argues it can recover prejudgment interest even under the Illinois Interest Act if Harris Bank is deemed to have breached a fiduciary duty to Euroholdings. This argument can be readily rejected. As discussed above, Euroholdings has not established a fixed or easily calculated sum as required by Illinois law. Thus, Defendant's motion to preclude Plaintiff from offering at trial any evidence regarding prejudgment interest alleged to be due to Plaintiff is granted.

## IV. CONCLUSION

**For the reasons set forth in this opinion, the Court grants in part and denies Defendant's first motion *in limine* to exclude improper damages evidence. The Court denies Defendant's motion to exclude any evidence concerning lost profits analysis by expert Paul Charnetzki arising out of Euroholdings' failed efforts to purchase 90 percent of LFG. The Court grants Defendant's motion with respect to the exclusion of any evidence concerning Euroholdings' alleged Union and Union Discount losses. The Court also grants Defendant's motion as to the exclusion of any evidence concerning prejudgment interest alleged to be due to Euroholdings.**

**SO ORDERED THIS 11th DAY OF MARCH, 2009**

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Celiza Patricia Braganca
Thomas D. Brooks
Monazza Arain Idrees
Daniel A. Shmikler
Bruce S. Sperling
Sperling & Slater, P.C.
55 West Monroe
Suite 3200
Chicago, IL 60603


Counsel for Plaintiff

Matthew Crowl
Michelle J. Fisk
J. Mark Fisher
Lawrence Heftman
John C. Martin
Michelle J. Murphy
Ronald S. Safer
Schiff Hardin LLP
6600 Sears Tower
233 South Wacker Drive
Chicago, IL 60606


Counsel for Defendant