**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EUROHOLDINGS CAPITAL & INVESTMENT CORP., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| HARRIS N.A., | ) ) | JUDGE CHARLES R. NORGLE |
| Defendant. | ) ) ) | MAGISTRATE MORTON DENLOW |
| HARRIS N.A., | ) ) ) ) | |
| Counter-Plaintiff, | ) ) ) | No. 05 C 1181 |
| v. | ) ) | |
| EUROHOLDINGS CAPITAL & INVESTMENT CORP., | ) ) ) | |
| Counter-Defendant. | ) | |

### HARRIS BANK, N.A.'S ("HARRIS") MOTION FOR JUDGMENT AS A MATTER OF LAW

After nearly three weeks of testimony, Plaintiff Euroholdings Capital & Investment Corp. (f/k/a Athenian Capital Holdings & hereinafter "ACH") has failed to prove that Harris conspired to tortiously interfere with ACH's relationship with LFG or that Harris owed ACH a fiduciary duty. Harris is not legally responsible for LFG's decision to sell its business to Refco instead of to ACH or for LFG's failure to fully repay ACH's loans.

### Standard for Rule 50 Motion for Judgment as a Matter of Law

When "a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the Court may "grant a motion for judgment as a matter of law against the party on a claim or defense . . . that can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(A)(1)(b); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 890 (7th Cir. 2001) (affirming grant of Rule 50(a) motion in defendants' favor); *see also Mizwicki v. Helwig*, 196 F.3d 828, 831 (7th Cir. 1999). Once trial begins, the only question is whether the non-moving party has put enough evidence before the jury to permit it to decide in his favor, considering that evidence in the light most favorable to the non-moving party. *See, e.g., Runyon v. Applied Extrusion Techn., Inc.* 619 F.3d 735, 739 (7th Cir. 2010). Plaintiff must offer evidence sufficient for a reasonable jury to find the elements of each claim. *See Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005).

## I. ACH'S FIDUCIARY DUTY CLAIM FAILS BECAUSE THERE IS NO EVIDENCE HARRIS OWED ACH ANY DUTY.

Count II (Fiduciary Duty) asserts that Harris owed a fiduciary duty to ACH and that it breached that duty by failing to disclose its lending decisions regarding LFG to ACH. It alleges that Harris breached its fiduciary duty to ACH by failing to disclose an alleged decision to ask LFG to move its banking relationship when Mr. Papadopoulos had an alleged two minute call with Mr. Turley. This claim fails on both prongs. There is no evidence that Harris owed ACH any duty. Nor is there any evidence Harris withheld information from ACH.

### A. Standard for Proving a Fiduciary Duty.

Certain relationships such as doctor-patient and lawyer-client impose fiduciary duties as a matter of law. *Polansky v. Anderson*, No. 04 C 3526, 2007 WL 4162807, at *6 (N.D. Ill. Nov.

20, 2007). When the relationship is not a fiduciary one as a matter of law, "the party asserting the existence of the relationship has the burden of establishing such by clear and convincing evidence." *Id.* at *7, quoting *Gonzalzles v. Am. Exp. Credit Corp.,* 733 N.E.2d 345, 353 (Ill. App. Ct. 2000); *see also Farmer City Bank v. Guingrich*, 487 N.E.2d 758, 763 (Ill. App. Ct. 1985). In order to establish a fiduciary relationship, the plaintiff must prove that it reposed trust and confidence in a dominant and superior entity or individual that accepted that reliance and exerted dominance over the inferior party. *Polanksy*, 2007 WL 4162807, at *6; *Farmer City Bank*, 487 N.E.2d at 763. "Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist." *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 630 N.E.2d 940, 947 (Ill. App. Ct. 1994).

**B.    Harris Owed No Fiduciary Duty to ACH.**

Mr. Papadopoulos, ACH's primary representative put it succinctly:

> Q.    You had no relationship with Harris Bank, did you?
>
> A.    They [Harris] had no relationship with ACH.

Tr. 611. Mr. Papdopoulos admitted that ACH had no depository relationship with Harris. *Id.* He admitted that Harris was not ACH's advisor or consultant. Tr. 610-11. He admitted that ACH would not consult Harris before making a loan. Tr. 611.

This conclusion was undeniable. Harris had virtually no contact with ACH. There were at most two brief introductory meetings between Mr. Papadopoulos and Harris. Tr. 1027:8-10. There is simply no evidence, let alone clear and convincing evidence, that Harris was ACH's fiduciary.

At most, ACH was a potential customer of Harris, a relationship which imposed no fiduciary duties on Harris. A lender-creditor relationship is not a fiduciary one even if actually consummated. *CSY Liquidating Corp. v. Harris Trust & Sav. Bank*, No. 96 C 1216, 1998 WL 157065, at *17 (N.D. Ill. Mar. 31, 1998), *aff'd* 162 F.3d 929 (7th Cir. 1998) ("As a general rule, lenders do not owe a fiduciary duty to their borrowers."); *Johnson v. Edwardsville National Bank & Trust*, 594 N.E.2d 342, 345 (Ill. App. Ct. 1992) (relationship between debtor and creditor is not a fiduciary one). The only exception to this rule is when the creditor "exercises 'dominion and control' over the borrower" such that it either owns shares of the borrower or takes over operating control of the business. *See CSY Liquidating Corp.*, 1998 WL 157065, at *17. There is no evidence that Harris controlled ACH in any way, let alone to the degree required to impose a fiduciary duty.

Harris and ACH were merely both creditors of LFG. And it is well established that a bank does not have a duty to disclose the financial condition of its debtor to third parties. *See Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 435 (7th Cir. 1996) ("Merely lending money to [a debtor], in accordance with its loan agreement, did not create a duty on the part of Harris to warn ... other creditors of the risk that the debtor was financially shaky."); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) (bank has no duty to speak up for benefit of non-customer dealing with bank's customer); *see also Mid-Am. Nat'l Bank of Chicago v. First Sav. & Loan Assoc. of S. Holland*, 515 N.E.2d 176, 180-81 (Ill. App. 1987) (finding lender had no duty to warn purchaser of property and mortgagee regarding risks of property acquisition).[1]

---

[1] Harris also could not have a fiduciary duty of disclosure to ACH because Illinois law forbids Harris from disclosing its lending decisions about LFG, Harris' customer, to third parties. *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) (rejecting fiduciary duty of disclosure claim because 205 ILCS 5/48.1(c) of the Illinois Banking Act forbid banks from disclosing information regarding its customers); *see also The Northern Trust Co. v. VII South*

### C. ACH Failed to Prove That Harris Withheld Any Information That Would Have Prevented ACH's $10 Million Loan to LFG.

Harris is also entitled to judgment on ACH's breach of fiduciary duty claims because, even under ACH's version of events, Harris had nothing to disclose to ACH at the time of ACH's $10 million loan to LFG. ACH claims that it would not have loaned LFG $10 million in February 2000 if Harris had disclosed its intention to end its banking relationship with LFG. The evidence is unrebutted, however, that ACH's loan predated Harris' decision to ask LFG to move its banking relationship. ACH agreed to loan LFG $10 million on February 8, 2000. *See* JTX 43. ACH presented no testimony that Harris made any adverse decision regarding LFG before February 8th.[2] To the contrary, Harris' internal lending transaction summary shows that Harris decided not to extend the maturity date of LFG's subdebt on February 14, 2000. *See* JTX 7.

Further, the record establishes that ACH's knowledge of LFG's financial position was superior to Harris'. The evidence is uniform that Harris did not know of the issues raised by the CME audit until the very end of February. Harris did not know that LFG had a capital shortfall or a material inadequacy until a meeting on February 28th or 29th. *See* Tr. 1146; Tr. 912-13, 931-32; 1284:7-1286:4; 1288:17-1290:12. In contrast, Ed Buchanan, ACH's representative, had access to all of this information as it was happening. He had an office in LFG, next to the CEO and nothing was hidden from him. Tr. 451:25-452:21, 307:8-10, 773-774, 865:4-9 & 934. Mr. Buchanan knew about Harris' decision not to extend LFG's loan further in mid-February. Tr. 954-55. Nothing was withheld from ACH.

---

*Michigan Assocs.*, 276 Ill.App.3d 355, 364 (1st Dist. 1995) (Illinois Bank Act "prohibit[s] [banks] from disclosing the status of loans made to other borrowers.")

[2] ACH alleged that Harris kept quiet during a February 25th telephone conversation, but ACH was already committed by that point to making the $10 million loan. Although ACH did not actually wire the funds until February 29, it was contractually obligated to make that loan as of February 8th.

There was no fiduciary duty for Harris to violate. Even if there were such a duty, there is no evidence Harris did anything to violate that duty.

## II. ACH'S FRAUD CLAIM HAS NO RECORD SUPPORT.

To prove a claim of fraudulent concealment, ACH has the burden of proving that 1) Harris had a fiduciary duty to disclose material facts to ACH; 2) Harris knowingly concealed from ACH material facts; 3) Harris concealed those facts with the intent to deceive and induce ACH to act; 4) ACH acted in justifiable reliance on the fact as it knew them; and 5) ACH suffered damages from the concealment of material facts by Harris. *Williams v. Chicago Osteopathic Health Systems*, 654 N.E.2d 613, 622 (Ill. App. Ct. 1995).

Specifically, ACH's fraud claim asserts that Mr. Turley failed to tell Mr. Papadopoulos that Harris had decided to withdraw as LFG's settlement bank during a less than two minute call they allegedly had on February 25. This claim fails for the reasons set forth above: Harris had no duty to disclose anything to ACH because there was no fiduciary relationship. Indeed, the law precluded Harris from discussing with Mr. Papadopoulos its internal decisions regarding LFG's loan. *See, e.g., B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) (rejecting fiduciary duty of disclosure claim because 205 ILCS 5/48.1(c) of the Illinois Banking Act forbid banks from disclosing information regarding its customers). Contrary to ACH's unsupported claim throughout this litigation, the Act bars disclosure of lending decisions, not simply customer financials. *See The Northern Trust Co. v. VII South Michigan Assocs.*, 276 Ill.App.3d 355, 364 (1st Dist. 1995) (Illinois Bank Act "prohibit[s] [banks] from disclosing the *status of loans* made to other borrowers.") (emphasis added).

Furthermore, ACH also failed to prove any reliance or causation from this alleged failure to disclose. ACH has a fundamental timing problem with its claim. ACH committed to make a $10 million loan to LFG on February 8, 2000, at least two weeks before this alleged telephone

call. JTX 43. ACH did not consult Harris before committing to this loan. Tr. 610-11, 1287-1288. ACH could not have relied upon Harris' non-disclosure in this alleged February 25, 2000, telephone conversation in making the February 8, 2000 loan.

There was also nothing for Harris to disclose in this alleged conversation. There is no evidence that Harris had made a decision to ask LFG to move its banking relationship by February 25, 2000. Indeed, the only evidence is that Harris had *not* made such a decision. On February 14, 2000, Harris renewed its settlement banking relationship and numerous other loan facilities with LFG. *See* JTX 24; Tr. 1144:5-14; 1181:4-1182:5, 1290-1292. On February 28, 2000, three days after that telephone conversation, Mr. Turley sought and received internal approval for a further extension of LFG's loan. JTX 25; Tr. 1145-46. At that time, Harris had no knowledge of the CME audit results, LFG's capital problem or the material inadequacy in LFG's books and records. Tr. 1146, 1294-1295.

Finally, the circumstances of the conversation did not require Mr. Turley to give any response. Taken in the light most favorable to ACH, this was an extremely brief conversation – less than 120 seconds. Tr. 596-97. Mr. Papadopoulos allegedly told Mr. Turley that he had given Mr. Vaughn a check for $10 million and that ACH was proceeding with the purchase of LFG. Tr. 596. Mr. Turley allegedly said, "thank you." *Id*. There was no representation of any type and no circumstance that called for an affirmative statement from Mr. Turley.

ACH also requests a jury instruction for an affirmative misrepresentation claim but there is no evidence of any affirmative misrepresentation. The elements of a fraudulent misrepresentation claim are similar to those of inducement except for ACH must prove an affirmative misrepresentation of a material fact rather than a concealment of that fact. *Stewart v. Thrasher*, 610 N.E.2d 799, 803 (Ill. App. Ct. 1993). ACH did not prove that Harris made any

affirmative misrepresentation of any material fact. The only statement that Mr. Papadopoulos alleges Mr. Turley made during this two minute conversation was "Thank you." Tr. 597. "Thank you" is not a representation of any type, let alone a misrepresentation of a material fact. Regardless, ACH cannot prove that the alleged February 25 statement induced it to make a loan it had already committed to 17 days prior. Finally, because ACH had real-time information from Mr. Buchanan about Harris' decision not to extend the subdebt further in mid-February 2000, (Tr. 954-55), ACH did not justifiably rely on Mr. Turley's alleged brief courtesy. *See Ryan v. Wersi Elect. GmbH & Co.*, 3 F.3d 174, 182 (7th Cir. 1993) ("[I]t is only where parties do not have equal knowledge or means of obtaining knowledge of the facts which are allegedly misrepresented that a person may justifiably rely on them.")

There is simply no evidence to support ACH's fraud claim.

### III. ACH'S TORTIOUS INTERFERENCE WITH THE APRIL 3 AGREEMENT AND UNJUST ENRICHMENT CLAIMS FAIL BECAUSE HARRIS WAS ENTITLED TO BE PAID FIRST BY LFG BEFORE ACH WAS PAID.

ACH bases several of its claims (Counts IV (Tortious Interference with the April 3 Agreement) and VI (Unjust Enrichment)) and its "out of pocket" damages claim for the amount LFG never fully repaid ACH, Papadopolous and Carras on the argument that Harris improperly repaid its loans before they were due. All of these claims fail as a matter of law because there is no factual or legal dispute that Harris had a contractual right to the repayment of its loans to LFG in their entirety, before anything was repaid on ACH's loans. Witness after witness, whether from ACH, LFG or Harris, all agreed that Harris was senior to LFG and had to be repaid in full first before ACH received a dime. Tr. 426-427, 429:25-431:11, 437:14-20, 653:2-13 & 973-974. ACH, Papadopolous and Carras executed subordination agreements in connection with every one of their loans to LFG acknowledging that Harris' loans were senior to their loans. *See* HTX 54.

(collection of subordination agreements). And Mr. Papadopolous testified that this order of repayment never changed. Tr. 653:2-13.

Most significantly, the April 3 Agreement between ACH, Papadopolous, Carras and LFG expressly required that Harris be paid by LFG before ACH was repaid. *See* JTX 55. In the April 3 Agreement, ACH, Papadopolous and Carras consented to LFG's sale to Refco and made arrangements for LFG to repay its loans to ACH after the Refco-LFG closing. An explicit condition of the April 3 agreement was that LFG must first pay Harris and the other senior lenders before LFG repaid ACH:

> <u>Bank debt</u>. **At or prior to Closing**, LFG will repay **in full** all amounts owed to Harris Bank, CommerzeBank [sic], Cole Taylor Bank, or any other lender who may have priority (as to payment, security, or otherwise) over the Subordinated Loans.

JTX 55 at § 9(b)(iv) (emphasis added). Harris could not have interfered with the April 3 Agreement by repaying its senior loans before ACH, Papadopolous and Carras' junior loans were paid by LFG because that is precisely what ACH, Papadopolous and Carras agreed to in the April 3 agreement. *See Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (requiring breach of agreement for tortious interference with contract claim).

Furthermore, Harris was not unjustly enriched when its loans to LFG were paid back before ACH's loans. For its unjust enrichment claim, ACH must prove that it had a greater entitlement than Harris to the money used to pay off Harris' loan to LFG. *See HPI Health Care Serv. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (requiring plaintiff to show retention of money is unjust and that plaintiff had a superior, equitable right to the money). And ACH cannot satisfy that burden because ACH, Papadopolous and Carras agreed in their subordination letters and in the April 3 Agreement that Harris' loan repayment came first. *See B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) ("repayment of a loan is not

-9-

'unjust' enrichment"); *El Camino Res, Ltd. v. Huntington Nat'l Bank*, 722 F.Supp.2d 875, 932-33 (W.D. Mich. 2010) ("a creditor who receives payment from a debtor is not unjustly enriched merely because other creditors went unpaid"). Judgment on Counts IV and VI should be awarded to Harris because Harris' repayment of its loans before ACH's loans did not tortiously interfere with the April 3 Agreement or constitute unjust enrichment.

ACH's claim that it obtained a security interest that gave it priority over Harris also lacks any legal basis. Every subordinated loan agreement signed by ACH, Papadopolous and Carras (which were form CBOE loan contracts) expressly forbade taking a security interest in LFG and amended any subsequent agreement to make it consistent with this requirement. *See* JTX 65, 66, 67 & 43; *see also* Tr. 434 & 437 (LFG's in house lawyer conceding that loan contracts forbid a security interest); Tr. 1163-1164 (Turley testifying that security interest violated loan agreements). Harris knew ACH could not have a valid security interest so there was no intentional interference with any lawful contract right.

Count IV also fails because Harris had no knowledge of the terms of the April 3 Agreement. Tortious interference is an intentional tort and it requires proof that Harris was aware of the terms of the April 3 Agreement between ACH and LFG. *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680, at *7 (N.D. Ill. Nov. 22, 2005) ("Precedent teaches that … actual awareness of existing contracts [is] required."). ACH presented no such evidence. Harris was not a party to that agreement. Harris' employee Steve Turley testified that he never received the April 3 Agreement. Tr. 1092-1094 & 1162:23-1163:2. No one from ACH or LFG testified that they notified Harris of that agreement prior to May 5, 2000 when Harris was first repaid a portion of its loans. Tr. 472:24-473:7. ACH's only attempt to prove knowledge is to point to a May 11, 2000 letter (JTX 11) to Steve

Turley (dated one day before Harris' final payment) that briefly references that ACH obtained a security interest in LFG in an April 3 Agreement without enclosing that agreement or identifying its terms. Since, as set forth above, all parties knew that ACH, Papadopolous and Carras were legally barred from obtaining a security interest, that brief reference hardly establishes the requisite knowledge needed for intentional interference with a legitimate contract right. *See In re Douglas Dunhill, Inc.*, 22 B.R. 953 (N.D. Ill. Sept. 13, 1982) (granting summary judgment due to lack of evidence of defendants' receipt of agreement or knowledge of its terms). In short, Harris could not have intentionally interfered with the April 3 Agreement because they never knew of any lawful terms in it.

Finally, this claim is squarely barred by the Credit Agreements Act. The only interference alleged by ACH is that Harris repaid its loans in violation of Harris' loan agreement with LFG. Since ACH is not in privity with Harris, ACH cannot impose liability on Harris for its conduct under its credit agreement with LFG. *See* 815 ILCS 160/3.1. ACH cannot identify any other alleged interference which purportedly prevented the repayment of its loans.

## IV. ACH FAILED TO PROVE THAT LFG BREACHED THE PURCHASE AGREEMENT.

The evidence is clear that, at best, ACH and LFG had an agreement to reach an agreement. ACH had ample opportunity to buy LFG. It chose not to do so and now blames Harris for its choice. ACH's claim fails as a matter of law because ACH's negotiations with LFG dragged on beyond the deadline in their written agreement. ACH and LFG agreed, in writing, to go their separate ways. There was no breach of any agreement. Thus, ACH's claim against Harris for tortious interference must fail.

For ACH to establish tortious interference in contract, ACH had to prove the following elements: (1) a valid and enforceable contract; (2) defendants' awareness of the contractual

obligation; (3) defendants' intentional and unjustified inducement of the breach; (4) subsequent breach caused by defendants' unlawful conduct; and (5) resultant damages. *Burrell v. City of Matoon*, 378 F.3d 642, 652 (7th Cir. 2004). ACH failed to prove an enforceable contract requiring LFG to sell to ACH; defendants' awareness of the contractual obligation; any breach by LFG in not selling to ACH; or any intentional or unjustified inducement of any breach.

### A. There Was No Contract After the Capital Hole Was Discovered.

A purchase agreement was signed on December 31, 1999. JTX 47. After that time, the terms were constantly changing. The price was reduced almost 25% at the beginning of February when a bullion trader lost $2 million. Tr. 412-414 & 630:112-18.

Once Mr. Papadopoulos was told of the magnitude of the CME audit results in March 2000, he knew that "everything" had to be renegotiated with Steve Klemen. Tr. 624-25. Similarly, Mr. Belom understood that the price was going to change dramatically because of the decreased capital in the company discovered by the CME in February 2000. Tr. 421-424.

And after the results of the CME audit became clear, LFG and ACH negotiated a termination agreement giving either party the unconditional right to terminate the agreement. JTX 49 (March 8, 2000 Agreement). That agreement also fully released either party for their failure to close. *Id.* The parties were focused on termination, not purchase.

### B. An At Will Contract Cannot Be The Basis Of A Tortious Interference With Contract Claim.

ACH must prove that LFG breached the purchase agreement to sustain its claim of tortious interference with contract. *See Cody*, 409 F.3d at 859 (breach of contract is a required element of a tortious interference claim). Termination of a contract that can be terminated at will by either party cannot support a tortious interference with contract claim. *Id.* (affirming dismissal of tortious interference with contract claim because termination of an at will contract is

not a breach); *Prudential Ins. Co. of Amer. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985) (affirming dismissal of tortious interference claim because contract was terminable at will); *Accurso v. United Airlines, Inc.*, 109 F.Supp.2d 953, 962 (N.D. Ill. 2000) (granting summary judgment on tortious interference with at will contract claim.)

      **C.    LFG Did Not Breach its Purchase Agreement with ACH by Not Selling to ACH.**

LFG did not breach the ACH-LFG purchase agreement by selling its assets to Refco because LFG and ACH modified the Purchase Agreement to permit termination for "any or no reason" and ACH consented to the Refco deal. LFG and ACH initially signed a purchase agreement on or about December 31, 1999. *See* JTX 47. The Agreement called for a January 10, 2000 closing and permitted either LFG or ACH to terminate the agreement if the parties could not agree on schedules by January 31 (which they did not) or if the closing did not occur by February 29, 2000 (which it did not). *See id.* at Section 8.1. LFG and ACH amended the purchase agreement on February 3 to reduce the purchase price, but left the closing deadline unchanged. *See* JTX 48. LFG and ACH did not close by the February 29th deadline.

Next, LFG and ACH expressly agreed in writing on March 8, 2000, that either party had "the *unconditional* right to terminate the Purchase Agreement *at any time for any reason or no reason . . .*" JTX 49 (emphasis added). LFG's sale of its assets to Refco instead of to ACH could not constitute a breach of the ACH-LFG purchase agreement because ACH agreed to LFG's unconditional right to cancel the ACH deal.

Then, on April 3, 2000, to "induce [Refco] to acquire certain assets of LFG," ACH expressly consented to LFG's sale to Refco in exchange for $1 million. *See* HTX 60 & JTX 55. ACH chose to walk away from purchasing LFG in exchange for $1 million from Refco and a

-13-

release from LFG. Harris is not responsible for ACH's decision. ACH's tortious interference claim therefore fails and judgment should be granted to Harris on Count I.

### D. No Evidence of Knowledge of Final Agreement or Intent to Interfere.

Further, there is no evidence that Harris acted intentionally to cause a breach of the contract. There is no evidence that Harris even knew of any final agreement or of any of the amendments to the agreement. Tr. 470-473, 652:24-653:1, 916:20-917:7, 1137:5-19, 1283:3-12; 1286:24-1288:16. ACH's inability to prove that Harris had knowledge of any obligation by LFG to sell to ACH is fatal to its claim. *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680, at *7 (N.D. Ill. Nov. 22, 2005) ("Precedent teaches that . . . actual awareness of existing contracts [is] required."); *See In re Douglas Dunhill, Inc.*, 22 B.R. 953 (N.D. Ill. Sept. 13, 1982) (granting summary judgment due to lack of evidence of defendants' receipt of agreement or knowledge of its terms). Harris cannot knowingly interfere with an agreement when it is not aware of its terms.

Even if Harris did know of the original purchase agreement, it is clear Harris did not act to cause LFG to violate that agreement. The parties are agreed that Harris twice extended the maturity date of its loan to LFG for the purpose of facilitating the purchase of LFG by ACH. *See* Statement of Uncontested Facts, ¶¶ 10, 12 (stating that Harris extended LFG's loan maturity date twice in December 1999 and January 2000 to "in order to facilitate the closing of the Athenian Purchase Agreement.") Even at the end of February, Harris gave internal approval for yet another extension of the loan to facilitate the sale of LFG to ACH. *See* JTX 25. It was only when Harris learned of the CME audit results, LFG's withholding of this information, LFG's auditors' ignorance as to where over $11 million had gone and the material inadequacy in LFG's books and records that Harris asked LFG to move its banking relationship. Even if Harris gave

LFG a short deadline to make that change - and it did not - there would be no evidence that it did so to induce a breach of LFG's purchase agreement with ACH.

> E. **ACH Failed to Prove Harris' Actions were Unjustified or Malicious.**

Even if ACH were able to prove interference, ACH cannot satisfy its burden to show Harris' conduct was malicious and unjustified. In intentional interference with contract cases, Illinois courts recognize a privilege where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc*., 131 Ill.2d 145, 157 (Ill. 1989). Harris was privileged to decline to further extend the maturity date on its subordinated debt and, under its at will settlement banking agreement, request that LFG find a new settlement bank. The undisputed evidence shows that LFG was undergoing serious financial problems (material inadequacy, material adjustments to capital, repeated violations of federal regulations and loan agreements). Indeed, ACH's own witness, independent auditor John Hague, described LFG as the "worst set of books and records [he had] ever seen in [his] 30 years of auditing FCMs." Tr. 800.

ACH bears the burden to prove there was no justifiable or legitimate basis for Harris' conduct. *HPI Health Care*, 131 Ill.2d at 156 ("In Illinois, this court has repeatedly stated that where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."); *see also Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div*., 775 F.2d 781, 790 (7th Cir. 1985) ("Where a conditional privilege exists, the plaintiff, to succeed on a claim of tortious interference with contract, must allege and prove that the agent's intentional acts were not taken to further its principal's best interests, but to further its personal goals or to injure the other party to the contract.").

ACH plainly has not produced evidence sufficient for a reasonable jury to find that Harris' actions were entirely unjustified and malicious and not motivated by its own financial interest in protecting its loans.

## V. ACH FAILED TO PROVE A REASONABLE EXPECTATION OF PURCHASING LFG.

ACH's tortious interference with prospective business relationship fails for the same reason. ACH could not have a reasonable expectation of purchasing LFG after it agreed on March 8 that LFG could simply walk away from any deal and then explicitly consented to LFG's sale to Refco for $1 million.

Plaintiff must prove the following elements to establish tortious interference with a prospective business relationship: 1) a "reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *American Hardware Manufacturers Association v. Reed Elsevier, Inc.*, No. 03 CV 9421, 2010 WL 55708, at *13 (N.D. Ill. Jan 4, 2010). A reasonable and legitimate expectancy cannot be based on "mere hope or opportunity of a future business relationship." *Id.*, quoting *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 520 F.Supp.2d 1012, 1022 (N.D. Ill. 2007).

At the outset, ACH cannot have a reasonable expectancy claim when an agreement actually exists. *See Delphi Indus., Inc. v. Stroh Brewery Co.*, 945 F. 2d 215, 218 (7th Cir. 1991) ("An action for prospective economic advantage cannot be maintained upon the breach of an existing contract."); *Alvarez v. Hi-Temp, Inc.*, No. 03 C 2610, 2004 WL 603489, at *2 (N.D. Ill. March 24, 2004) (dismissing prospective economic advantage claim due to presence of contract).

ACH cannot have it both ways. ACH claims that there were agreements governing its interest in purchasing LFG and repayment of its loans so it cannot pursue expectancy claims to judgment.

In any event, ACH did not have a reasonable expectation of purchasing LFG because ACH agreed that LFG could call off their deal for any reason or no reason and major terms were going to be negotiated. *See* JTX 49 (granting LFG the "unconditional" right not to sell to ACH "at any time for any reason.") A plaintiff cannot have a reasonable expectancy of entering a business relationship when the contract expressly allows for termination without cause. *Brdecka v. Gleaner Life Insurance Society*, No. 02 C 3076, 2005 WL 1563218, at *4-5 (N.D. Ill. June 6, 2005) (granting summary judgment on tortious interference with business expectancy claim because contract expressly permitted termination of relationship without cause). Nor can a party have a reasonable business expectancy when major terms, like price, remain in flux. *See Kemmerer v. MacArthur Foundation*, 594 F. Supp. 121, 122 (N.D. Ill. 1984) (dismissing tortious interference with prospective economic advantage because price and interest rate terms were not resolved). Given the termination provision and unknown key terms, ACH was merely a prospective buyer of LFG entitled to no protection from other acquirers. *See Stefani v. Baird & Warner, Inc.*, 510 N.E.2d 65, 71 (Ill. App. 1987) (holding potential buyer of real estate did not have a valid business expectancy). Judgment should be awarded to Harris on this claim because ACH did not prove a reasonable expectation of purchasing LFG.

## VI. ACH FAILED TO PROVE ANY CONSPIRACY BETWEEN HARRIS AND REFCO.

ACH did not prove that Harris and Refco had an agreement to interfere with ACH's purchase of LFG or to inhibit LFG's repayment of ACH's loans. A claim for conspiracy requires proof, by clear and convincing evidence, that there was (1) an agreement, (2) for the purpose of committing an unlawful act (3) in the furtherance of which one of the conspirators

committed an overt tortious act. *See Foodcomm Int'l v. Barry*, 463 F.Supp.2d 818, 830-32 (N.D. Ill. 2006).

As an initial matter, ACH's conspiracy claims fail because ACH proved no underlying torts. Conspiracy is not an independent tort so ACH must not only prove an agreement to commit a tortious act, but also that Harris actually committed an underlying tort. *See Adcock v. Brakegate*, 645 N.E.2d 888, 894 (Ill. 1995) ("An agreement to commit a wrongful act is not a tort, even if it might be a crime. A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort.") (internal citations omitted). Since ACH failed to show any tortious interference with any agreement or expectancy, the conspiracy claim cannot stand.

Second, ACH has not even attempted to introduce any tortious conduct by Refco. The evidence simply shows that Refco made an offer to purchase LFG, it was accepted and the deal closed. Accordingly, the conspiracy claim serves no purpose; it does not change the potential scope of liability. It is therefore mere surplusage and only retained to inflame the jury. For that reason alone, it should be dismissed.

Finally, ACH did not prove any agreement between Harris and Refco to interfere with ACH's purchase of LFG or repayment of LFG's loans. No witness testified to any such agreement. Harris proposed Refco as a potential acquirer to LFG only after LFG's owner told Harris that the ACH deal was deteriorating and that he would be interested in other potential acquirers. Tr. 1303-1304. Moreover, in writing, LFG authorized Harris to disclose LFG's financial information to Refco and release Harris from any liability for doing so. *See* JTX 50. LFG and Refco then directly and independently negotiated their purchase agreement and closed the deal. Tr. 1354-1355 (Refco CEO Phil Bennett testifying that he had no conversations with

Harris regarding LFG after initial contact informing him that LFG was looking for a buyer). Both Mr. Turley and Hohman, as well as Refco CEO Bennett, stated that they had no contact after their initial call discussing a possible LFG deal and that Harris had no involvement in the negotiations of the deal. Tr. 1043-1044, 1056, 1280, 1305 & 1354-1355. Euroholdings relies on the $250,000 finder's fee agreement with Harris, but the uncontested evidence shows that the agreement covered various services beyond LFG and was not raised or negotiated until August 2000. Tr. 1115-1117, 1279-1280, 1344-1345, 1348 & 1357. It shows payment for a lawful service; not a conspiracy. ACH certainly has not met the weighty burden of proving that Harris and Refco agreed to interfere with ACH's purchase of LFG or loan repayment by clear and convincing evidence.

Contrary to any claim of conspiracy between Harris and Refco, the evidence shows that ACH and Refco acted in concert without Harris' knowledge to divert money owed to Harris. Refco entered a secret side deal with ACH that required Refco to pay ACH $1 million for ACH's consent to Refco's purchase of LFG. *See* HTX 59. Without informing Harris, Refco paid off $1 million of LFG's debt to ACH. That $1 million payment was an improper pre-payment of ACH's loans which were subordinate to Harris' loans to LFG. Refco's premature payment of ACH's loans without notification to Harris is hardly the act of a co-conspirator attempting to prevent LFG from repaying ACH's loans.

Harris should be awarded judgment on ACH's conspiracy claim because ACH failed to prove any underlying tort or any agreement between Refco and Harris to commit a tortious act.

## CONCLUSION

No reasonable jury could find in favor of ACH on any of their counts. Accordingly, judgment should be awarded to Harris pursuant to Rule 50(a) on all counts of ACH's complaint.

Dated: February 1, 2011

Respectfully submitted,

By: /s/ Lawrence H. Heftman
Ronald S. Safer
Lawrence H. Heftman
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
*Attorneys for Harris Bank N.A.*