**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EUROHOLDINGS CAPITAL & INVESTMENT CORP., | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>)<br>) |
| HARRIS N.A., | )    JUDGE CHARLES R. NORGLE<br>) |
| Defendant. | )    MAGISTRATE MORTON DENLOW<br>) |
| HARRIS N.A., | )<br>)<br>) |
| Counter-Plaintiff, | )<br>) |
| v. | )    No. 05 C 1181<br>) |
| EUROHOLDINGS CAPITAL & INVESTMENT CORP., | )<br>)<br>) |
| Counter-Defendant. | ) |

## HARRIS, N.A.'S RENEWED
## MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Federal Rule of Civil Procedure 50(a), judgment should be granted to Harris on Count I of Plaintiff Euroholdings Capital & Investment Corp.'s (f/k/a Athenian Capital Holdings & hereinafter "ACH") Complaint.[1]

---

[1] On February 7, the Court granted Harris' Rule 50 motion with respect to Counts II through VI of ACH's Complaint and any claim for "out of pocket" damages. The Court requested this further briefing on Harris' motion for judgment on Count I.

## I. THE RECORD DOES NOT SUPPORT ACH'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

As an initial matter, ACH's "contract" with LFG was terminable at will by either party for any reason. JTX 49 (March 8, 2000 Agreement) (granting both LFG and ACH "the *unconditional* right to terminate the Purchase Agreement *at any time for any reason or no reason* . . ." (emphasis added); JTX 47 (December 31, 1999 Purchase Agreement) (contract terminable at will after January 31, 2000 if schedules not complete and after February 29, 2000, for any or no reason). Illinois law is clear that an at will contract cannot be the basis of a tortious interference with contract claim. *See Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) ("Under Illinois law, '[a] defendant's inducement of the cancellation of an at will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations.") quoting *Prudential Ins. Co. of Am. V. Sipula*, 776 F.2d 157, 162 (7th Cir. 1983); *see also Storm & Assocs., Ltd. v. Cuculich*, 700 N.E.2d 202, 210 (Ill. App. Ct. 1998) ("An action for tortious interference with a contract which is terminable at will, however, is classified as one for intentional interference with prospective economic advantage.")

## II. NO REASONABLE JUROR COULD FIND THAT ACH PROVED EACH ELEMENT OF TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY.

Plaintiff must prove the following elements to establish tortious interference with a prospective business relationship: (1) a reasonable expectation of entering into a valid business relationship; (2) the defendant knew of the plaintiff's expectancy; (3) the defendant's purposeful interference prevented the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *American Hardware Manufacturers Association v. Reed Elsevier, Inc.*, No. 03 CV 9421, 2010 WL 55708, at *13 (N.D. Ill. Jan 4, 2010). A reasonable and legitimate expectancy cannot be based on "mere hope or opportunity of a future business relationship." *Id.*, quoting *Bus. Sys. Eng'g, Inc. v. Int'l*

*Bus. Machines Corp.,* 520 F.Supp.2d 1012, 1022 (N.D. Ill. 2007). Count I fails for several reasons.

### A. ACH Had No Reasonable Expectancy of Purchasing LFG in March 2000.

By March 2000, the deal between ACH and LFG had fallen apart. The parties had missed all of the closing deadlines in their purchase agreement so that LFG was free to terminate the deal. *See* JTX 47, ¶ 8.1(b) (permitting termination without cause if no closing occurred on or before February 29, 2000). ACH's CEO, Paul Papadopoulos, testified that, come the first week of March, "everything," including price, had to be renegotiated due to LFG's audit problems. Tr. 624:24-625:13. LFG's president and majority owner, Steve Klemen, testified that the negotiations were "chaotic," ACH's money to close did not arrive, the deal was not "progressing" and there was no "meeting of the minds." Tr. 1662:25-1664:12, 1694:1-5. Mr. Klemen further testified that, by March 2000, ACH had "bailed out," the deal was "in flux" and he went looking for other buyers. Tr. 1674:15-19; 1676:2-1677:18. Mr. Hohman testified without contradiction that, on or about March 1, 2000, Mr. Klemen told him that the LFG deal "was deteriorating, basically falling apart." Tr. 1303:13-1304:10. ACH and LFG had not agreed on schedules or obtained regulatory approval. *See* JTX 49. In their March 8 walkaway agreement, ACH and LFG confirmed the moribund state of their deal, granted each other the unconditional right to terminate the deal for "any reason or no reason" and released each other from all claims, including claims under the purchase agreement for failing to close. *Id.*

The written agreement ACH negotiated and signed is definitive proof that ACH lacked any reasonable expectancy by March 2000. *Bredecka v. Gleaner Life Insurance Society* is directly on point. It holds that a party to a contract cannot have a reasonable expectancy when the parties have granted each other the right to terminate for no reason at all. No. 02 C 3076, 2005 WL 1563218, at *4-5 (N.D. Ill. June 6, 2005) (granting summary judgment on tortious

interference with business expectancy claim because contract expressly permitted termination of relationship without cause). *Accord Williams v. Weaver*, 495 N.E.2d 1147, 1152 (1st Dist. 1986) (mere hope of future employment not a reasonable expectancy due to provision granting "full discretionary power to terminate"). Given the termination rights in the purchase agreement and the March 8 walkaway agreement and with the purchase price and other material terms subject to further negotiation, ACH was merely a prospective buyer of LFG entitled to no protection from other acquirers. *See Stefani v. Baird & Warner, Inc.*, 510 N.E.2d 65, 71 (Ill. App. 1987) (holding potential buyer of real estate did not have a valid business expectancy); *see also Kemmerer v. MacArthur Foundation*, 594 F. Supp. 121, 122 (N.D. Ill. 1984) (dismissing tortious interference with prospective economic advantage because price and interest rate terms were not resolved). Judgment should be awarded to Harris on this claim because no reasonable juror could find that ACH had a reasonable expectation of purchasing LFG in March 2000.

### B. Harris Had No Knowledge of any Reasonable Expectancy in March 2000.

Harris lacked sufficient knowledge of any business expectancy for ACH to purchase LFG in March 2000 at the time of its alleged interference. ACH relies principally on 1999 introductory meetings and correspondence to attempt to prove Harris' knowledge but ignores what Harris was told subsequently as well as the intervening time and inactivity. LFG and ACH maintained the deal would close by December 31, 1999. Tr. 1125. That did not happen. Then, Harris was told that the deal would close in January. Tr. 1127. That did not happen. Then Harris was told the deal would close in February. Tr. 1130. That did not happen. ACH's intent to purchase LFG expressed in December is vitiated by this sequence of events. Whatever their express intent was in December, their inactivity in the ensuing months spoke more clearly than any words: There was no expectancy that the LFG/ACH discussions were ever going to ripen into action.

It is undisputed that Harris neither received nor was told about the amendments to the original purchase agreement executed in February and March 2000. Tr. 470-473, 652:24-653:1, 916:20-917:7, 1137:5-19, 1283:3-12 and 1286:24-1288:16. Instead, on approximately March 1, Steve Klemen told Chuck Hohman that the ACH deal "was deteriorating, basically falling apart." Tr. 1303:13-1304:10. Mr. Klemen told Mr. Hohman that he wanted to talk to other buyers and agreed to speak with Refco. *Id.*; 1674:3-8. And the very next day, March 2, 2000, Mr. Klemen gave Harris written authorization to disclose LFG's financial information to Refco for due diligence and released Harris from any liability for doing so. *See* JTX 50. These actions by Mr. Klemen, the CEO and principal owner of LFG, are dispositive; Harris received the message that there was no expectation the deal with ACH would go forward.

Given the state of Harris' knowledge, no reasonable juror could find that Harris had sufficient knowledge of a reasonable expectancy that ACH would purchase LFG. Tortious interference is an intentional tort and it requires proof that Harris was aware of a reasonable business expectancy *at the time* of its alleged interference. *See Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1224 (7th Cir. 1988) (affirming directed verdict on tortious interference claim because defendant only "had general knowledge of the letter of intent, but not its terms" so it lacked sufficient knowledge for tortious interference claim). Even taking ACH's version of the facts as true, Harris had already been told by LFG's owner in early March 2000 that the ACH deal fell apart. That was, according to ACH, two weeks before Harris gave the purported three day settlement banking deadline. Nothing in the record shows that Harris received any information that ACH's potential deal was proceeding after March 1, 2000. To the contrary, Harris was instructed by LFG's owner to release information to Refco for its due diligence on

LFG. Accordingly, Harris cannot be held liable for intentional interference when it had been told that ACH's business expectancy had evaporated.[2]

### C. No Evidence Establishes that Harris Caused Klemen to Sell LFG's Assets to Refco Instead of ACH.

Only Steve Klemen can explain why LFG sold to Refco. He was the CEO, majority owner and sole decisionmaker for LFG. Tr. 460:25-461:6, 461:13-17, 924:3-11; 939:10-14; 1655:12-14. Mr. Vaughn and Mr. Belom were LFG employees with no stake in the company and no say in selecting the buyer for Mr. Klemen's membership interest in LFG. *Id.* Mr. Klemen's testimony is clear: At the time Mr. Klemen signed the Letter of Intent to sell LFG's customer business to Refco in mid-March 2000, he was not aware of any settlement banking deadline imposed by Harris. Tr. 1671:8-16, 1685:15-18 & 1694:6-10. Klemen never heard that Harris set any deadline. *Id.* Klemen's testimony shows that ACH's deadline theory, even if it is assumed to be true, could not have interfered with ACH's expectancy. Klemen alone decided to sell to Refco instead of ACH. Klemen's decision could not have been prompted by any deadline from Harris because he was never aware of one.

That is the end of the inquiry. ACH had to prove that its expectancy did not ripen into a valid agreement because of Harris' tortious conduct. *See Soderlund Brothers, Inc. v. Carrier Corp.*, 663 N.E.2d 1, 13 (Ill. App. Ct. 1996) (affirming summary judgment on tortious interference claim because alleged interference did not prevent expectancy from becoming valid business relationship); *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417-418 (7th Cir. 2009)

---

[2] ACH repeatedly points to the February 8, 2000, $10 million loan as proof that it intended to pursue the agreement. ACH's loan is no more evidence of its intent to purchase LFG than Harris' loan proves its intent to purchase LFG. Harris had repeatedly been told that the deal was going to close. Additional loans do nothing to advance the purchase of the company; a loan is not an equity investment. The distinction between a loan and equity was significant to Harris. Tr. 1131-32.

(affirming summary judgment because no evidence showed interference impacted physician's ability to obtain hospital privileges). Mr. Klemen conclusively disproved causation for ACH's claim because any such deadline could not have been the reason Klemen chose to sell LFG's assets to Refco. Tr. 1671:8-16, 1685:15-18 & 1694:6-10.

### D. ACH Failed to Prove Harris' Conduct Was Unjustified or Malicious.

Even if ACH were able to produce evidence of interference, ACH cannot prove Harris' actions were unjustified or malicious. A mere expectancy, as opposed to a contractual right, is entitled to less protection from other parties' rights and interests. *Soderlund Brothers, Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1996). Illinois courts recognize a privilege where a defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's expectancy. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc*., 131 Ill.2d 145, 157 (Ill. 1989). For example, Harris had a privilege to protect its own financial interests and rights under its loan agreements even if those actions interfered with ACH's expectancy. *See Soderlund Bros, Inc.*, 663 N.E.2d at 8 (citing privilege of competition and right to protect own economic interests); *Chowdhury v. Marathon Oil Co.*, 949 F. Supp. 1353 (N.D. Ill. 1997) (holding decision made to further own economic interests as privileged); *see also* 44B Am. Jur. 2d Interference § 26 (2010) (identifying "[e]xercise of a contractual right" as a recognized privilege for tortious interference claim). ACH thus bears the burden to prove Harris' actions were unjustified or malicious. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc*., 131 Ill.2d 145, 157 (Ill. 1989).

Harris does not bear the burden of proving that its actions were privileged because the issue of privilege was apparent from the face of the Complaint. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc*., 131 Ill.2d 145, 156 (Ill. 1989) (finding privilege from face of Complaint and requiring plaintiff to "plead and prove that defendant's conduct was unjustified or

malicious"). The Complaint acknowledged that Harris had loan agreements with LFG, was acting to protect "its own exposure on loans to LFG" and affirmatively alleged that Harris' actions were unjustified or malicious, recognizing its burden to overcome Harris' privilege. (Complaint, Doc. 1 at ¶¶ 12-15, 20 & 38). ACH appropriately assumed the burden to prove that Harris' conduct was unjustified or malicious. Even if, as ACH now contends, Harris bears the burden to prove its privilege, Harris has done so and the end result is the same.

Harris was privileged to decline to further extend the maturity date on its subordinated debt. Harris also was entitled to terminate its at will settlement banking agreement and request that LFG find a new settlement bank. *See* JTX 44 (LFG-Harris settlement banking agreement containing no time period); *Jespersen v. Minnesota Min. and Mfg. Co.*, 700 N.E.2d 1014, 1017, 183 Ill.2d 290, 295-296 (Ill. 1998) ("the rule that contracts of indefinite duration are terminable at will has long been followed in Illinois"); Tr. 1188:2-15 (settlement banking agreement – JTX 44 – is at will relationship). The undisputed evidence shows that Harris took steps to protect its financial interests after learning that LFG was undergoing serious financial problems, such as the material inadequacy of its financial accounting, material adjustments to capital, repeated violations of federal regulations and material breaches of its loan agreement with Harris. On February 29 and March 3, 2000, LFG reported numerous "termination conditions" of Harris loan agreements. *See* HTX 41 & 46. Indeed, ACH's own witness, independent auditor John Hague, described LFG as the "worst set of books and records [he had] ever seen in [his] 30 years of auditing FCMs." Tr. 800:3-8. Mr. Klemen said there was "chaos" at LFG throughout 2000 and there was no explanation for the missing capital. Tr. 1665:12-25, 1667:3-16 & 1668:21-1670:13.

There is no dispute that Harris had a contractual right to declare a default on LFG's loans for LFG's material breaches. *See* JTX 38. Harris was privileged to refuse to further extend

credit, including settlement banking services, to an extremely troubled borrower that repeatedly violated Harris' loan agreements. *See Israel Aircraft Indus, Ltd. v. Sanwa Business Credit Corp.*, 16 F.3d 198 (7th Cir. 1994) ("we could not find, any case holding a financial institution liable in tort for failing to make a concession that would have facilitated an extension of credit. By refusing to lend money, a bank does not 'tortiously interfere' with the use the borrower would make of the funds.")

Because Harris had a privilege to enforce its contracts and protect its financial interests, ACH bears the burden to prove there was no justifiable or legitimate basis for Harris' conduct. *HPI Health Care*, 131 Ill.2d at 156 ("In Illinois, this court has repeatedly stated that where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."). This is an extremely high standard. ACH only can prove that Harris' actions were unjustified or malicious if they were "totally unrelated or even antagonistic to the interest [of Harris] which gave rise to defendant's privilege." *Id.* at 158. ACH has not provided any evidence that Harris was not motivated to protect its depositors from the credit risk posed by its loans to LFG, but rather solely out of spite for ACH. *See Miller v. Lockport Realty Group, Inc.*, 878 N.E.2d 171, 175-176 (Ill. App. 2007) (granting summary judgment because alleged interference was privileged and not simply motivated by spite or ill will). Indeed, the entirety of the record makes it clear Harris rightfully was acting to manage its risk.

Nor can ACH overcome Harris' privilege by proving that Harris acted by "improper means." Acts which are never privileged include "fraud, deceit, intimidation or deliberate disparagement." *See Miller*, 878 N.E.2d at 178-179. This Court has already held that ACH cannot prove any fraud, deceit or breach of fiduciary duty by Harris. And there is no dispute that

-9-

Harris' default letter was a proper exercise of its contractual rights and entirely accurate. *See* JTX 38.[3] *See Soderlund*, 663 N.E.2d at 10 (no liability for interference when one "merely gives truthful information to another").

ACH plainly has not produced evidence sufficient for a reasonable jury to find that Harris' actions were entirely unjustified and malicious or were committed through improper means.

## CONCLUSION

No reasonable jury could find in favor of ACH on Count I. Accordingly, judgment should be awarded to Harris pursuant to Rule 50(a).

Dated: February 8, 2011

Respectfully submitted,

By: /s/ Lawrence H. Heftman
Ronald S. Safer
Lawrence H. Heftman
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
*Attorneys for Harris Bank N.A.*

---

[3] ACH's attempt to impose liability on Harris for the conduct of its loan agreements with LFG also runs afoul of the Credit Agreements Act. As this Court held previously in ruling on Harris' motion in limine, ACH cannot base Harris' liability on a claim that Harris violated or acted improperly pursuant to its credit agreements with LFG. That is precisely what ACH is trying to do on Count I.